IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MICHAEL AISENBERG,                     )
                                       )
                  Plaintiff,           )
                                       )
v.                                     )      Civil Action No. 1:22cv0125 (TSE/JFA)
                                       )
RELIANCE STANDARD LIFE                 )
INSURANCE COMPANY,                     )
                                       )
                  Defendant.           )
_____)

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation

pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 10,

13). This action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § 1001 *et seq.*, arises from defendant Reliance Standard Life Insurance Company's

("RSL" or "defendant") denial of plaintiff Michael Aisenberg's ("Aisenberg" or "plaintiff")

application for long-term disability ("LTD") benefits. The parties disagree as to whether

Aisenberg was entitled to receive LTD benefits after January 13, 2021 under the terms of the

employee benefit plan administered and insured by RSL. For the reasons stated below, the

undersigned recommends that plaintiff's motion for summary judgment be granted, and

defendant's motion for summary judgment be denied.

## I. PROCEDURAL BACKGROUND

In September 2020, plaintiff's employer submitted an application and supporting

information to RSL concerning LTD benefits for plaintiff. (Administrative Record ("AR") 216–

288). The application listed the date plaintiff last worked as June 29, 2020. (AR 217). In

1

October 2020, plaintiff provided RSL with additional information concerning his disability

claim.  (AR 290–296).  Based on a review of the medical records, on November 20, 2020, RSL

found that starting on June 29, 2020, plaintiff was precluded from engaging in any sustained

work function on a frequent and consistent basis due to surgery and recovery from his double

coronary artery bypass graft and completion of cardiac rehabilitation.  (AR 61).  However, RSL

later determined that plaintiff was not entitled to any LTD benefits from the policy, finding that

plaintiff's impairment did not continue beyond January 12, 2021.  (AR 182–184).  On July 2,

2021, plaintiff appealed RSL's denial of LTD benefits.  (AR 1704–85).  On December 10, 2021,

RSL largely upheld its prior decision to deny benefits.  (AR 2351–57).  RSL determined that

plaintiff was not totally disabled as of January 13, 2021, but he was entitled to one day of LTD

benefits under the terms of the policy (from the conclusion of the elimination period on January

12, 2021 to January 13, 2021).  (*Id.*).

On February 4, 2022, plaintiff filed this civil action seeking judicial review of RSL's

decision denying LTD benefits pursuant to the provisions of ERISA.  (Docket no. 1).  Both

plaintiff and defendant filed their motions for summary judgment on June 24, 2022, and they

were originally noticed for a hearing before the District Judge on July 29, 2022.  (Docket nos.

10, 13, 15, 16).  Each party then filed their memoranda in opposition on July 8, 2022 and replies

to the memoranda in opposition on July 14, 2022.  (Docket no. 17, 18, 21, 22).  On July 13,

2022, an order was entered by the District Judge moving the hearing on the motions for summary

judgment to August 12, 2022.  (Docket no. 20).  On August 3, 2022, the District Judge entered

an order cancelling the scheduled hearing on the pending motions for summary judgment and

referred the case to the undersigned "for preparation of a prompt report and recommendation."

(Docket no. 23).[1]  Pursuant to 28 U.S.C. § 636(b)(1)(B), the parties will have an opportunity to file objections to these proposed findings and recommendations and the District Judge will then need to make a *de novo* determination as to those portions of the proposed findings and recommendations to which an objection has been made.

## II. STANDARD OF REVIEW

"[W]hen a plaintiff challenges the denial or termination of benefits under an ERISA plan, the reviewing court must apply a '*de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 378 (4th Cir. 2018) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "Under the abuse of discretion standard, the administrator's decision will not be disturbed if it 'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999) (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (1997)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* Here, the parties agree that RSL serves as a claims review fiduciary as it relates to the policy at issue. (Docket no. 11 at 10; Docket no. 14 at 12). Therefore, RSL's decision denying LTD benefits to plaintiff must be reviewed under the abuse of discretion standard.

---

[1] Given the size of the administrative record, the fulsome briefing by the parties, the unexpected nature of this referral, the limited resources available to magistrate judges, the reassignment of cases resulting from the retirement of a magistrate judge, and other pending matters, the issuance of this report and recommendation may not have complied with the "prompt" directive in the District Judge's order.

## III. FACTUAL BACKGROUND

### A.   RSL's LTD Policy

Since 2005, RSL has administered a disability insurance policy for certain employees of The MITRE Corporation ("MITRE").  (AR 1).  This policy is governed by the laws of Massachusetts and/or ERISA, and it "provides income replacement benefits for Total Disability from Sickness or Injury."  (*Id.*).  As it relates to LTD benefits under the policy, RSL will pay a monthly benefit to the insured if the insured: "(1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us."  (AR 21). This monthly benefit will cease at the earliest of: "(1) the date the Insured ceases to be Totally Disabled; (2) the date the Insured dies; (3) the Maximum Duration of Benefits, as shown on the Schedule of Benefits page, has ended; or (4) the date the Insured fails to furnish the required proof of Total Disability."  (AR 22).

The elimination period is defined in the policy as "a period of consecutive days of Total Disability, as shown on the Schedule of Benefits page, for which no benefit is payable.  It begins on the first day of Total Disability."  (AR 11).  It ends at the greater of "180 consecutive days of Total Disability or the end of The MITRE Corporation's continuation program."  (AR 9). Monthly benefits will be paid at the end of the elimination period so long as the other criteria for the monthly benefits are met.  (AR 21).  In this case the maximum duration of benefits would be 21 months since plaintiff was 68 years old when he discontinued working at MITRE.  (AR 9).

The policy provides that a claimant is totally disabled when, as a result of injury or sickness, "during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation."  (AR

4

12). A claimant who is partially disabled, meaning that "an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis," is considered totally disabled, except during the elimination period. (*Id.*). After the first 24 months of the monthly benefit being paid, total disability continues only when "an Insured cannot perform the material duties of any occupation." (*Id.*).

## B.    Plaintiff's Age, Education, and Employment History

Plaintiff was 68 years old on June 29, 2020, his last day of work at MITRE. (AR 61, 311). Plaintiff received his B.A. from the University of Pennsylvania and J.D. from the University of Maine School of Law. (AR 368). Plaintiff is a member of the District of Columbia Bar. (*Id.*). Prior to his job at MITRE, he worked for the Federal Communications Commission, Digital Equipment Corporation, VeriSign, Inc., and Electronic Warfare Associates-Information & Infrastructure Technologies, Inc. (*Id.*). Plaintiff also has experience in academia, serving as a lecturer in communications law at the University of Maryland and an adjunct professor in the technology ethics program at the University of Fairfax, as well as having been appointed a senior fellow of the George Washington University Center for Cyber and Homeland Security in 2015 and a fellow of the Institute for Critical Infrastructure Technologies. (*Id.*).

At MITRE, plaintiff served as principal cyber security counsel in the Center for National Security of MITRE's Defense and Intelligence Federally Funded Research and Development Center. (*Id.*). In this role, plaintiff was responsible for providing strategic policy advice and analysis in support of MITRE's systems engineering work for federal agencies in defense, intelligence, and homeland security. (*Id.*). Plaintiff holds Top Secret clearances from the Department of Defense (DoD), Department of Homeland Security (DHS), and the U.S. Intelligence Community. (*Id.*). His supervisor described plaintiff's role as constantly (almost

hourly) working with senior leadership at the DHS Cybersecurity and Infrastructure Security Agency, the Director of National Intelligence, or the DoD Chief Information Officer either on the phone, in high level virtual meetings, or traveling around the Washington, DC metro area to meet in person with senior personnel prior to COVID-19. (AR 132–133). Plaintiff's job was very demanding and stressful with short deadlines and frequent and unexpected changes in the requirements from the various agencies. (*Id.*). In June 2020, plaintiff was earning $15,083 per month from MITRE. (AR 262).

### C.    Overview of Plaintiff's Medical History and Treatment[2]

A brief overview of plaintiff's medical history and a short summary of his treatment is provided to give a framework for the analysis that follows. RSL's claim notes indicate that plaintiff's medical history includes a history of obesity, hypertension, hyperlipidemia, and vague dyspnea. (AR 61). However, the primary issue involved in this matter concerns plaintiff's cardiovascular condition following a double coronary artery bypass graft ("CABG") procedure that took place in July 2020.

#### i. Plaintiff's July 2020 CABG Operation

Plaintiff noticed shortness of breath with exertion as far back as 2016. (AR 290). Plaintiff raised this concern with his internist Dr. Gwilym Parry in 2020 who ordered a coronary CT scan that was conducted on June 29, 2020. (AR 311–316). That scan showed "[e]xtensive multivessel obstructive coronary artery disease" and further evaluation with coronary catherization was recommended. (AR 312). On the morning of July 7, 2020, plaintiff went to

---

[2] The AR contains extensive medical records from various sources relating to plaintiff's medical treatments. This summary provides an overview of plaintiff's medical treatments and conditions relevant to his claims and is not intended to be an exhaustive list of every medical treatment, especially since much of the medical history is not in dispute.

Inova Fairfax Hospital for what was anticipated to be an outpatient cardiac catherization by Dr. Howard. (AR 377–380).  Upon receiving the results of that procedure showing functionally severe stenosis of the proximal left anterior descending and chronic total occlusion of the proximal to mid right coronary artery (AR 351–353), a surgical consult with Dr. Singh, a cardiothoracic surgeon, was scheduled at the hospital (AR 395–402).  After discussing the results of the cardiac catherization with Dr. Singh and a nurse practitioner, plaintiff decided to be admitted at Inova Fairfax Hospital and to proceed with a CABG on an expedited basis.  (AR 408–409).  Plaintiff was then admitted and on July 9, 2020, Dr. Singh performed open heart surgery with a double CABG.  (AR 384, 534–537).  Plaintiff remained at Inova Fairfax Hospital from July 7, 2020 to July 14, 2020.  (AR 383).  Plaintiff was released from the hospital on July 14, 2020 with a discharge plan after it was determined he was medically stable.  (AR 383–389).

### ii. Cardiac Rehabilitation Period

Plaintiff participated in a cardiac rehabilitation program from August 25, 2020 to November 23, 2020.  (1633–40).  During this time, it was unclear when plaintiff may be able to return to work.  Dr. Parry completed a certification of physician or practitioner for employee medical absence form on August 20, 2020, which stated that the return to work date was "TBD / 12/2020."  (AR 221–222).  Dr. Singh completed a similar form on August 21, 2020, and at that time he estimated a return to work date for plaintiff as October 1, 2020.  (AR 224–225).

On October 7, 2020, plaintiff's cardiologist, Dr. Cossa, conducted a physical exam of plaintiff.  (AR 327–328).  Dr. Cossa's notes indicate that plaintiff was stable and doing physically well, with his hypertension and hyperlipidemia controlled, his cough resolved, and obesity improving with diet and exercise.  (AR 328).  Plaintiff's PVC was asymptomatic.  (Id.).  However, plaintiff was advised not to return to his former employment that involved very high stress situations, including being on call for emergencies, which would likely contribute to

worsening of his condition over time. (*Id.*). He was advised to continue his cardiac rehabilitation and follow up in six months. (*Id.*).

On December 16, 2020, plaintiff underwent a treadmill stress test at Virginia Heart. (AR 1667). Plaintiff reached maximum predicted heart rate during that test, but he noted fatigue and left shoulder discomfort which resolved with recovery. (*Id.*). The conclusion of that test indicated "[n]ormal maximal exercise treadmill test with no clinical or ECG evidence of ischemia." (*Id.*). On January 8, 2021, Dr. Cossa provided a further explanation of the results of the stress test stating it was a "submaximal study with limited exercise capacity for only 4-1/2 minutes on the treadmill with the complaint of some shoulder discomfort during the study." (AR 1670). It was noted that plaintiff's exercise tolerance is well below average, which is a negative prognostic indicator. (*Id.*). Dr. Cossa recommended plaintiff "continue with a regular exercise regimen, generally healthy habits and avoid stressful work situation." (*Id.*).

**D.      RSL's Adjudication of Plaintiff's LTD Benefits Application**

A brief overview of RSL's assessment of plaintiff's application for LTD benefits is provided as a framework for the detailed discussion below. MITRE originally submitted an application to RSL for LTD benefits for plaintiff. (AR 216–288). In October 2020, plaintiff submitted his own statement and supporting information directly to RSL. (AR 290–296). Throughout the adjudication process additional information was presented to RSL by MITRE, plaintiff, plaintiff's health care providers, and plaintiff's counsel.

*i. Initial RSL assessment of plaintiff's application for LTD benefits*

On November 20, 2020, Nurse Alison House conducted an initial medical review of plaintiff's application for LTD benefits. Nurse House concluded that, "[b]ased on medical records reviewed, claimant is precluded from engaging in any sustained work function on a

frequent and consistent basis from date of loss through 1/12/2021 due to surgery and recovery from CABG X2 and completion of cardiac rehabilitation." (AR 61). Nurse House further noted that if "claimant is unable to return to prior level of exertion on 1/13/2020[2021] suggest updated medical records from cardiology, surgery and cardiac rehab summary to assess status." (*Id.*). Notably, January 12, 2021 was the end of the elimination period and when RSL would be required to begin paying benefits to plaintiff if he met the criteria of being totally disabled. On November 30, 2020, RSL sent plaintiff a request for more information, including any outstanding medical records from his doctors that may be relevant to the claim. (AR 180–181).

Following an office visit with plaintiff on December 2, 2020, Dr. Cossa wrote a letter stating that plaintiff had made a reasonable recovery, but he still had periods of fatigue and episodes of chest discomfort associated with exertion. (AR 371–372). Dr. Cossa noted that plaintiff worked in a high stress position as an attorney for MITRE with on-call demands and long workdays, which is why he had not been able to return to work during his recovery from surgery. (AR 372). Dr. Cossa wrote that, plaintiff "is no longer able to perform his previous level of work due to his health condition. It was felt that the patient's occupation as an attorney would provide excessive stress over time and would potentially cause further decline in his condition with additional health complications in the future." (*Id.*). Since the additional stress of his occupation "would be considered detrimental to his health," Dr. Cossa advised that plaintiff should be totally disabled from his work as an attorney going forward. (*Id.*).

Dr. Parry provided a similar letter on December 8, 2020, stating that plaintiff was "currently undergoing cardiac rehabilitation and doing well without chest pain and improving shortness of breath and stamina." (AR 1646). Even though plaintiff had improved, Dr. Parry recommended plaintiff remain out of his current position at MITRE based on the "extraordinary

9

amount of persistent stress associated with his responsibilities including, but not limited to, high level decision making involving matters of national security and potential life-threatening situations" and the continual on-call nature of the position 24 hours a day, 7 days a week. (*Id.*). Dr. Parry wrote that coronary artery bypass surgery is an intervention to prevent injury to the heart, but it is not a cure. (*Id.*). Dr. Parry stated that without dramatic reduction in plaintiff's level of continuous stress, "he faces further injury and severe health issues." (*Id.*).

### ii. RSL's initial denial of LTD benefits

On December 28, 2020, Nurse House conducted another medical review of plaintiff's application after receiving the additional letters from Dr. Cossa and Dr. Parry discussed above along with plaintiff's cardiac rehab flow sheets and notes. (AR 62). Nurse House again found plaintiff was disabled from the June 29, 2020 to January 12, 2021. (*Id.*). While noting that both Dr. Cossa and Dr. Parry indicated that plaintiff is no longer able to perform his previous level of work because of his health condition and excessive stress over time, Nurse House noted that the "additional information provided lacks physical findings, signs and symptoms of clinical findings or ROS findings that would preclude claimant from work function." (*Id.*).

In a letter dated January 4, 2021, RSL informed plaintiff and MITRE of the denial of plaintiff's LTD claim. (AR 182–185). RSL cited the medical information received from Dr. Cossa and Dr. Parry, including the letter from Dr. Parry dated December 8, 2020. (AR 183). While acknowledging Dr. Parry's opinion that plaintiff should not engage in any position that would present intense level of stress as he faces further injury and severe health issues with continued stress, RSL stated that Dr. Parry's "letter did not provide any physical exam findings, clinical findings, symptoms, or review of systems that would preclude you from work function beyond January 12, 2021." (*Id.*). Additionally, RSL cited the December 16, 2020 treadmill

stress test, stating that it revealed normal heart rate and blood pressure responses to exercise, a normal age-related exercise capacity, and no chest pain or ischemic ECG changes. (*Id.*).

### iii. RSL's assessment on appeal

Plaintiff appealed RSL's denial of benefits on July 2, 2021. (AR 1704–85). RSL sent the appeal and plaintiff's medical information to Reliable Review Services ("RRS") for a peer review report. (AR 1859). RSL asked RRS to answer a number of questions, which included determining the "presence or absence of physical impairment as of 6/29/20," "if the claimant has work capacity on a full time consistent basis as of 6/29/20," and "medically supported period of physical impairment/duration/prognosis." (AR 1819–20).

RRS peer reviewer Dr. Samuel S. Hahn submitted an Advisory Report on August 3, 2021. (AR 1815–31). Dr. Hahn found that "[i]mpairment was supported as of 6/29/2020 due to his symptoms and findings at coronary angiography." (AR 1820). Based on the surgery, stay in the hospital, and cardiac rehabilitation sessions, Dr. Hahn found that total disability was supported through October 7, 2020, as he noted that a "vast majority of patients are recovered from uncomplicated bypass surgery by 3 months, which [in] this case would have been until 10/7/2020." (AR 1820–21). Dr. Hahn wrote that while there was "little evidence supporting ongoing disability from 10/7/2020 until 12/16/2020," which was the date of the exercise stress test, Dr. Hahn extended the disability to December 16, 2020 to give plaintiff "the benefit of the doubt." (AR 1821). However, Dr. Hahn opined that "there is no objective evidence of cardiac impairment after 12/16/2020." (*Id.*). In his view, plaintiff's attending physicians exclusively relied on subjective evidence and the fear of stress, rather than any current actual physical limitations. (*Id.*). Dr. Hahn stated that, due to the normal stress test, "there is no reason to expect the claimant is not capable of at least full time light work after 12/16/2020." (*Id.*).

11

Dr. Hahn emphasized his disagreement with the attending physicians' position regarding stress and disability, stating disability "is defined as the current inability or limitation to perform a task." (*Id.*). Dr. Hahn believed that plaintiff's doctors' opinions that future job stress "will result in further cardiovascular deterioration" was unsubstantiated for three reasons. (*Id.*). First, "[t]here is no randomized controlled trial that shows relieving chronic job stress results in the secondary prevention of cardiovascular events. We as cardiologists commonly counsel stress reduction as a holistic way to improve health but there is little to no scientific evidence that supports this." (AR 1822). Second, plaintiff "clearly does not wish to return to his work as an attorney for Mitre Corporation but there is no medical evidence to support that he currently physically cannot perform his duties." (*Id.*). Lastly, "[e]ven if he does not work at his prior exact position, there is no evidence to suggest that he could not work as an attorney doing 'less stressful' legal work." (*Id.*).

After plaintiff submitted additional medical records and an updated letter from Dr. Parry in August 2021 (AR 1837–54), Dr. Hahn submitted an addendum to his Advisory Report (AR 1878–90). Dr. Hahn wrote that the "additional information submitted does not change any of my original opinions," as "[n]one of his physicians cite any specific cardiovascular limitations or restrictions that would prevent [plaintiff] from returning to his job as an Attorney." (AR 1879). Plaintiff then responded to Dr. Hahn's report submitting several medical studies linking stress, including work-related stress, and cardiovascular events. (AR 2233-2330).

On December 21, 2021, RSL issued its final decision denying LTD benefits to plaintiff. (AR 2351–57). In the final decision RSL found that "limiting exposure/risk, among other things, does not qualify as being *Totally Disabled*." (AR 2354). In support of this decision RSL cited and adopted most of Dr. Hahn's conclusions. (AR 2354–56). The decision states that RSL

"found [plaintiff] was fully capable of performing the material duties of his *regular occupation* as of January 13, 2021, and thereby did not satisfy definition of being *Totally Disabled* ongoing as required for LTD benefits to be payable after that date." (AR 2356). This final decision found that the initial decision improperly determined that plaintiff failed to submit satisfactory proof of being totally disabled through the elimination period. (AR 2353). The final decision states that "in reality the impairment was supported until one (1) day thereafter." (*Id*.). As a result, RSL found that plaintiff was entitled to LTD benefits under the terms of the policy on January 12, 2021. (AR 2355). However, the final decision then states that based on the evidence, RSL concluded that plaintiff was not totally disabled the following day (January 13, 2021) and therefore plaintiff was only entitled to one day of LTD benefits. (*Id*.).

## IV. ANALYSIS

### A.   Overview

This case concerns whether the final decision issued by RSL on December 10, 2021 — that plaintiff was entitled to LTD benefits as of January 12, 2021, but was not entitled to LTD benefits as of January 13, 2021 — is the result of a deliberate, principled reasoning process, and is supported by substantial evidence. Two main issues are involved in this analysis. First is whether the risk of recurrence of a physical condition, such as cardiovascular deterioration, should be considered in determining whether an insured can perform the material duties of his/her regular occupation. The second issue is how to define an insured's "regular occupation." The RSL policy states that an insured is "Totally Disabled" when, "as a result of an Injury or Sickness . . . an Insured cannot perform the material duties of his/her regular occupation." (AR 12). Given RSL's finding that risk of future of harm does not satisfy the "sickness or injury" requirement in the policy, there was limited discussion of the regular occupation issue in the final

13

decision.  However, in the briefing concerning these motions, RSL argues that even if a risk of future harm should have been considered, plaintiff's regular occupation was "attorney" and the denial of benefits should be upheld because plaintiff could be employed as an attorney in a low stress environment.  (Docket nos. 11, 17).

As to the first issue concerning whether the risk of future harm should be considered in the disability analysis, RSL's final decision states:

> Ultimately, limiting exposure/risk, among other things, does not qualify as a [sic] being *Totally Disabled*.  There must be documentation of a physical or mental impairment, which substantiates your client's meeting the Policy's definition of being *Totally Disabled*, in order to be eligible to receive *Monthly Benefits*.  In other words, "being at risk" is not considered a *Sickness* or *Injury*, resulting in a lack of functionality.  (AR 2354).

> Again, in any case, limiting exposure/risk, among other things, does not qualify as a [sic] being *Totally Disabled* (as defined by the Policy).  There must be documentation of a physical or mental impairment, which substantiates your client's meeting the Policy's definition of being *Totally Disabled*, in order to be eligible to receive *Monthly Benefits*.  In this case, your argument simply does not stand up to this test.  (AR 2356).

> [W]e must again point out that limiting exposure or risk, as well as being at risk, if so, are not considered a *Sickness* or *Injury*, nor do they result in a lack of function.  (*Id.*).

The second issue concerns the interpretation of "his/her regular occupation," a phrase that is not included in the definition section of the policy.  (AR 11–12).  As set out in the policy, benefits would be payable for up to 24 months if an insured "cannot perform the material duties of his/her regular occupation."  (AR 12).[3]  In the final decision, RSL initially states that plaintiff's regular occupation "is the occupation which he was routinely performing when he was first unable to work full time (consistently) with The MITRE Corporation."  (AR 2352).  It then

---

[3] After 24 months, benefits would only be paid if the insured cannot perform the material duties of *any occupation* and is not limited to "his/her regular occupation."  (AR 12).

states, "this specifically pertains to Mr. Aisenberg's occupation as it is performed within the national economy, and not how tasks required of his [sic] were performed for a specific employer or at any specific location." (*Id.*).

In making its final decision that plaintiff "was fully capable of performing the material duties of his *regular occupation* as of January 13, 2021, and thereby did not satisfy definition of being *Totally Disabled* ongoing as required for LTD benefits to be payable after that date," RSL relied primarily on the language of the policy and on the reports from Dr. Hahn and to a lesser extent the findings of Nurse House. (AR 2354–56). In his initial report, Dr. Hahn made his position clear that risk of future harm should not be a factor in determining disability saying "I completely disagree with the APs' [attending physicians] position regarding stress and disability. Disability is defined as the current inability or limitation to perform a task." (AR 1821). Dr. Hahn went on to say that even if stress was to be considered, plaintiff's attending physicians' concern that future job stress will result in further cardiovascular deterioration is "unsubstantiated" for three reasons (AR 1821–22), which were duplicated in RSL's final decision (AR 2355). First, Dr. Hahn stated that there is no randomized controlled trial that shows relieving chronic job stress results in the secondary prevention of cardiovascular events. (AR 1822, 2355). Second, Dr. Hahn states there is no medical evidence to support that plaintiff is not "currently physically" able to perform his duties at MITRE. (*Id.*). Finally, Dr. Hahn states that even if plaintiff does not work at his prior exact position, there is no evidence to suggest that he could not work as an attorney doing "less stressful" legal work. (*Id.*). Plaintiff argues that RSL's final decision is arbitrary, capricious, not supported by substantial evidence, and is unreasonable. (Docket no. 14). On the other hand, RSL contends that it did not abuse its discretion in denying plaintiff's LTD benefits claim beyond January 13, 2021. (Docket no. 11).

15

**B.    RSL should have considered the potential for future harm due to stress caused by plaintiff returning to work.**

RSL's final decision is clear; it says being at risk is not considered a sickness or injury which results in a lack of functionality, that limiting exposure and risk does not qualify as being totally disabled, and there must be documentation of a physical or mental impairment to support a LTD claim. (AR 2354, 2356). In the final decision, RSL summarizes plaintiff's argument as establishing that he continues to suffer from cardiovascular disease and his doctors agree that, due to his heart condition and highly stressful occupation, he should not return to work because of the high risk of future heart complications from stress if he returned to work. (AR 2354). RSL categorizes this argument as saying even though plaintiff's current medical conditions do not prevent him from working, in and of themselves, he should avoid work due to the possibility it could have an impact on his health in the future. (*Id.*). RSL then takes the firm position in its denial that "being at risk" is not considered a sickness or injury that it will consider in making a disability determination. (*Id.*). Having decided that the risk of future harm is not a factor to be considered, RSL found that the information provided did not support that "any level of impairment existed ongoing" and as a result plaintiff was not totally disabled as of January 13, 2021. (AR 2355). While the final decision does not specifically state it relies on Dr. Hahn's report in finding that "being at risk" is not considered a sickness or injury, it does include portions of Dr. Hahn's report in the decision, so they will be addressed.

Dr. Hahn indicates that he completely disagrees with plaintiff's treating physicians' position concerning stress and disability. (AR 1821, 1880, 2355). Dr. Hahn believes that disability is the "current inability or limitation to perform a task" and any concern that future job stress will result in further cardiovascular deterioration is not a "current actual physical limitation" and does not provide "objective medical evidence to support the disability claim."

(AR 1821, 1880). RSL adopted Dr. Hahn's interpretation that disability is the current inability or limitation to perform a task as indicated in RSL's determination that a physical or mental impairment precluding one from performing or functioning is required to support a claim of disability. Given this finding that "being at risk" is not to be considered and that the remaining evidence did not support "any level of impairment," RSL does not directly address whether plaintiff's claim of future risk is substantiated since it was not a factor to be considered in any event. Nevertheless, a review of the rationale given by Dr. Hahn that any risk of future harm is unsubstantiated that was duplicated in the final decision is discussed below.

Dr. Hahn states that "[t]here is no randomized controlled trial that shows relieving chronic job stress results in the secondary prevention of cardiovascular events." (AR 1822). Dr. Hahn carefully worded the language of his first point of justification to note the lack of a "randomized controlled trial" that linked "chronic job stress" with the "secondary prevention of cardiovascular events." (AR 1822). In doing so, Dr. Hahn attempts to convey that there is a lack of medical authority to justify plaintiff's doctor's concern that future job stress "will" result in further cardiovascular deterioration. However, this narrow approach misses the mark, as Dr. Hahn failed to account for the significant medical evidence that exists outside of "randomized control trials" relating to the reduction of "chronic job stress."

Taking a broader approach to the question at hand, the medical evidence supporting the link between stress and prevention of cardiovascular events is extensive. First, plaintiff provided defendant a considerable number of studies that support the connection between stress and the prevention of cardiovascular events. (AR 2233–2330). One of these studies, Work Stress and Risk of Death in Men and Women With and Without Cardiometabolic Disease, concludes that in men with cardiometabolic disease, the contribution of job strain to risk of death is clinically

17

significant and independent of conventional risk factors. (AR 2273–88). Even Dr. Hahn recognized that "we as cardiologists commonly counsel stress reduction as a holistic way to improve health." (AR 1822).

RSL's final decision made clear that no consideration would be given to risk of future harm and the disability determination would be limited to plaintiff's current physical ability to perform tasks. As discussed below, this interpretation is contrary to rulings in several ERISA cases, including at least one case with RSL as a party and one in the Fourth Circuit. In these decisions, and many others, courts have held that the risk of future harm should be considered in making a disability determination.

In *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381 (3rd Cir. 2003), the Third Circuit addressed whether the risk of future harm needs to be considered in making a disability determination.[4] *Lasser* involved an orthopedic surgeon in a small practice group that required him to see patients during office hours, perform scheduled surgeries, take night and weekend calls, and perform emergency surgery. *Id.* at 387. Lasser had a history of coronary heart disease including coronary bypass surgery in 1986 and a myocardial infraction in 1996. *Id.* at 383. Following his myocardial infraction in 1996, Lasser's treating physician advised him to reduce stress, including work-related stress. *Id.* Lasser eventually returned to work on a substantially reduced schedule by decreasing his patient load, no longer being on-call on nights and weekends, and not performing emergency surgeries. *Id.* Lasser filed a claim for LTD benefits with RSL stating that, as a result of his heart condition, he was not capable of performing the material duties of his regular occupation on a full-time basis because his doctors had advised him to

---

[4] As discussed below, the *Lasser* court also discussed the interpretation of the "regular occupation" language in the RSL policy.

reduce his work-related stress. *Id.* In December 1996, RSL approved Lasser's application for LTD benefits. *Id.* Following a review of Lasser's condition in late 1997, RSL received the results of a treadmill test showing no cardiovascular disability and terminated his benefits. *Id.* at 384, 389. After RSL appealed the district court's finding that the denial of benefits was arbitrary and capricious, the Third Circuit reviewed the medical evidence in the record, including an opinion from Lasser's treating physician that while Lasser's "functional stress test at the present time is excellent," the severity of his heart condition, while not readily measured by traditional testing measures, renders him just as disabled as a patient with more overt symptoms. *Id.* at 390. Based on the evidence presented, the court found that Lasser's heart condition precludes him from *safely* performing on-call duties and emergency surgery and that RSL's conclusion to the contrary was arbitrary and capricious. *Id.* at 391 (emphasis added). In a footnote addressing the dissenting opinion, the court disagreed with the position that "the risk that stress will cause future injury is insufficient to constitute a present disability" and stated that "whether risk of future effects creates a present disability depends on the probability of the future risk's occurrence." *Id.* at 391 n.12.[5] The court then rejected RSL's argument that it was "unreasonable" to expect RSL to accept an opinion that stress would exacerbate Lasser's condition without any range of probability or actual proof of increased harm. *Id.* at 391. The court clarified that once a disability claimant makes a *prima facie* showing of disability through physicians' reports, the burden then lies with the insurer to support the basis of its objection. *Id.*

---

[5] In *Pini v. First Unum Life Ins. Co.*, 981 F. Supp. 2d 386, 409 (W.D. Pa. 2013), the court acknowledged that the *Lasser* decision "recognized that a risk of 'future injury' induced by stress can sometimes create a 'present disability.'" In that case, the insurer did undertake a thorough analysis of plaintiff's risk of future harm based on work-related stress and made a determination that a stressful interaction with a specific supervisor would not preclude the performance of insured's duties for a different employer.

The Fourth Circuit addressed the "potential risk" issue and the *Lasser* decision in *Stanford v. Continental Cas. Co.*, 514 F.3d 354, 358 (4th Cir. 2008). In *Stanford,* the plaintiff was a trained nurse anesthetist with a history of substance abuse and claimed that Continental did not consider his potential for relapse into drug use in denying his request for LTD benefits. *Id.* at 355, 358. The court affirmed the denial of benefits, but in doing so, it distinguished the difference between Stanford's potential risk of relapse into drug use with Lasser's potential risk of having a heart attack. *Id.* at 358. The *Stanford* court noted that a number of cases support the argument that a risk of relapse (or future injury) is a form of disability under ERISA-governed benefit plans and cited the example from *Lasser*, where a "doctor with a heart condition who enters a high-stress environment like an operating room 'risks relapse' in the sense that the performance of his job duties may *cause* a heart attack." *Id.* As Judge Wilkinson discusses in his dissent, the majority's distinction between the risk of relapse into drug use and the risk of a heart attack limits the otherwise sweeping exclusion of medical conditions that cause "potential risk" to a more narrow exclusion of addictive relapse based on choice and temptation. *Id.* at 363. This is "good sense" because Continental's broad interpretation of "current impairment" as excluding any medical condition that does not make it literally impossible to perform work related tasks at the current time — even if that condition creates a grave medical risk that would make it unreasonably dangerous to perform work related tasks — is inconsistent with basic tenets of insurance law. *Id.*

The case law and common sense indicate that it is necessary to at least take into consideration and assess the potential for future risk of harm in returning to work when making a disability determination. For these reasons, the undersigned recommends a finding that RSL's steadfast refusal to do so was an abuse of discretion.

20

*i. Defendant's argument that plaintiff failed to prove risk of future harm*

Stepping back from its decision that any risk of future harm is not a factor to be considered in the disability determination, defendant's memorandum in support of its motion for summary judgment argues that plaintiff failed to prove that he was at risk for future harm. (Docket no. 11 at 13–15). Defendant cites to multiple cases to support the need to provide evidence supporting the risk of future harm, including *Pini v. First Unum Life Ins. Co.*, 981 F. Supp. 2d 386, 411 (W.D. Pa. 2013) and *Napoli v. First Unum Life Ins. Co.*, 2005 WL 975873 (S.D.N.Y. Apr. 22, 2005).

As plaintiff points out, defendant is raising a question that is not at issue here, at least as it relates to RSL's justification for denial of benefits. Defendant asserts that plaintiff did not provide sufficient evidence to prove that he was at risk of future harm, and the cases defendant cites relate to an insured's failure to provide sufficient evidence to show a probability of future harm. *See Pini*, 981 F. Supp. 2d at 411 ("Under the circumstances of this case, the existence of a disability was dependent upon the *probability* that Pini would suffer a relapse if she were to work as a product analyst for an employer other than CA."). That is not a basis that RSL relied upon in its final decision. RSL's justification for denying benefits in this case was that limiting risk or exposure, as well as being at risk, is not a factor to be considered in making a disability determination. However, statements in Dr. Hahn's report that are inserted into the final decision go a bit farther and state that, *as a general matter*, there is not sufficient medical evidence to support a causal connection between relieving chronic job stress and secondary prevention of cardiovascular events. This blanket statement would be applicable to any claimant, not one tailored to the evidence provided by plaintiff in this case. Dr. Hahn did not take issue with plaintiff's doctors counseling plaintiff to reduce stress given his serious heart condition. In fact, Dr. Hahn states that "we as cardiologists commonly counsel stress reduction." (AR 1822). This

21

wholesale refusal to acknowledge that chronic work-related stress may be detrimental to a person

with cardiovascular disease is separate and distinct from a claim that plaintiff did not provide

sufficient evidence concerning the extent that stress may be detrimental to his cardiovascular

health. In any event, the evidence from plaintiff's treating physicians refers to his work-related

stress(es) "likely contribute to worsening of his condition over time" (AR 328); "would

potentially cause further decline in his condition with additional health complications in the

future [and] would be considered detrimental to his health" (AR 372); "are a detriment to his

continued improvement and cardiovascular well-being" and "without dramatic reduction in Mr.

Aisenberg's level of continuous stress, he faces further injury and severe health issues" (AR

1646); and "would not only interfere with his recovery but amplify and accelerate his continued

cardiac risk" (AR 1839). All these statements justify a finding that plaintiff has presented a

*prima facie* case that given his medical condition, he should avoid returning to his former

employment. As discussed above, *Lasser* provides that once a claimant has made a *prima facie*

showing of disability through physicians' reports, the burden then shifts to the insurer to provide

sufficient support for any objection. *Lasser*, 344 F.3d at 391.

       As an additional reason to reject this argument, ERISA case law makes clear that

defendant is limited to justifications for denial that were provided in the administrative process.

*See Thompson v. Life Ins. Co. of N. Am.*, 30 F. App'x 160, 163 (4th Cir. 2002) ("A district

court's review is limited to whether the rationale set forth in the initial denial notice is

reasonable. A court may not consider a new reason for claim denial offered for the first time on

judicial review."); *Morris v. Lincoln Nat. Life Ins. Co.*, 2017 WL 11576789 (E.D. Va. Sep. 29,

2017) (holding that defendant cannot justify its denial of benefits based on a new interpretation

of the relevant provisions not raised during the administrative process). In defendant's reply

brief, it appears to pivot and argue that plaintiff's lack of evidence relates to the "regular occupation" issue in that plaintiff failed to prove that he was not capable of working as an attorney doing "less stressful legal work." (Docket no. 21). The "regular occupation" issue is discussed below. At least as it relates to the justification for denial of benefits that plaintiff failed to present evidence that high levels of stress would be detrimental to his cardiac health, defendant should be precluded from making this argument.

**C.      Plaintiff cannot perform the duties of his previous work at MITRE without facing the risk of future harm**

The second reason given by Dr. Hahn for saying plaintiff's doctors' concerns of future risk of harm are unsubstantiated is "[t]he claimant clearly does not wish to return to his work as an attorney for Mitre Corporation but there is no medical evidence to support that he currently physically cannot perform his duties." (AR 1822). Again, this statement focuses on whether plaintiff *currently* has any *physical* restriction that would preclude him from returning to his position at MITRE. Plaintiff claims that the high probability of future harm, as cited by his doctors, provides adequate justification to not return to work at his previous position at MITRE. (Docket no. 14 at 18–23). On the other hand, defendant claims that plaintiff did not provide evidence sufficient to prove that plaintiff could not return to work at MITRE. (Docket no. 11 at 15–20). Defendant points to the result of the treadmill stress test as evidence that plaintiff had recovered from his surgery and was healthy enough to return to work at MITRE. (*Id.* at 19).

*i. Plaintiff's worked in a high-stress job at MITRE*

Plaintiff contends, and defendant hardly disputes, that plaintiff's job at MITRE was one filled with a significant amount of stress. Serving as principal cyber security counsel at MITRE, plaintiff was working with many national security and intelligence agencies as clients. (AR 368). He dealt with numerous pressing national security issues, and he held a Top Secret

security clearance. (*Id.*). Plaintiff claims that, even though his job was primarily sedentary, he was always on call. (AR 131). He described his work as "a daily 12 hour or more exercise in stress." (AR 1734). Plaintiff's supervisor noted that plaintiff's job was "[v]ery demanding and stressful due to high demand and short timelines to deliver products requiring multiple contributors in many cases." (AR 133).

### ii. Doctors recommend plaintiff not return to his position at MITRE

Plaintiff's doctors have continually recommended he not return to work at his high stress job at MITRE. After his exam with plaintiff on October 7, 2020, Dr. Cossa recommended plaintiff not return to his previous employer due to stress and worsening condition over time. (AR 328). Dr. Cossa then wrote a letter, dated December 2, 2020, stating that plaintiff had not returned to work due to plaintiff's high stress position as an attorney for MITRE. (AR 372). Dr. Cossa wrote that plaintiff "is no longer able to perform his previous level of work due to his health condition. It was felt that the patient's occupation as an attorney would provide excessive stress over time and would potentially cause further decline in his condition with additional health complications in the future." (*Id.*). Dr. Parry wrote a letter, dated December 8, 2020, stating that even though plaintiff had improved, he recommended plaintiff remain out of his position at MITRE based on the "extraordinary amount of persistent stress associated with his responsibilities" and the continual on-call nature of the position. (AR 1646). Even in the summer of 2021, Dr. Parry and Dr. Shifrin were still encouraging plaintiff to not return to work. (AR 1839–41).

Even though plaintiff's doctors recommended plaintiff not return to his position at MITRE, that is not the end of discussion. As the Supreme Court has noted, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of

24

explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Courts are permitted to weigh each expert's opinion, even if it leads to assigning greater weight to the opinion of the treating physicians over those doctors that simply reviewed medical records. *See Bilheimer v. Federal Exp. Corp. Long Term Disability Plan*, 605 F. App'x 172 (4th Cir. 2015) ("Although a district court cannot require an administrator to assign certain weight to certain expert opinions, the district court was entitled to determine the weight of each expert's opinion and to afford more weight to the opinions of treating physicians.").

Here, defendant provides only limited conflicting evidence from Dr. Hahn and Nurse House as to defendant's ability to return to his high stress position at MITRE. Defendant points to Dr. Shifrin noting that plaintiff had "[n]ormal exercise capacity for age" and "[n]o chest pain or ischemic ECG changes with exercise" during the stress test on December 16, 2020. (AR 1844). The date of the stress test is what Dr. Hahn used as the date that plaintiff was no longer disabled. (AR 1821). To defendant, the result of the treadmill test provides *objective evidence* that there is no current, functional limitation. Defendant states that plaintiff has no objective evidence to the contrary (*i.e.* documentation of a current physical or mental impairment, which substantiates meeting the policy's definition of totally disabled). (AR 2356).

However, defendant once again fails to consider the potential future harm. The stress test indicates how plaintiff is reacting to physical exertion at that time. The concerns expressed by plaintiff's doctors are not focused on plaintiff's ability to handle a certain level of physical exertion at a specific time. They were worried about the impact of constant job stress on plaintiff's health. *See Buffaloe v. Reliance Standard Life Ins. Co.*, 2000 WL 33951195, at *7 (E.D.N.C. Oct. 26, 2000) ("[T]he disability resulting from heart and vascular disease is not only

that a patient may have difficulty performing tasks requiring physical exertion, but more critically the risk that the patient may suffer another heart attack or stroke."). While plaintiff's status at the time of the stress test may have provided some indication as to how plaintiff's cardiovascular system could handle certain levels of physical exertion at that specific time, the evidence that defendant provides is not sufficient to address the risk of working in a high stress job with plaintiff's serious cardiovascular condition.

For the most part, this issue comes down to whether risk of future harm should be considered. Plaintiff has not taken the position that he is physically unable to talk on the phone or attend meetings. Plaintiff's argument is that the high stress nature of his employment at MITRE would present a risk of serious harm. In turn, defendant does not accept that risk of future harm should be considered in deciding if plaintiff could perform his duties at MITRE. For the reasons discussed above and for the reasons discussed concerning the appropriateness of considering risk of future harm, it is recommended that the court find that RSL abused its discretion to the extent it determined that plaintiff could perform his previous duties at MITRE.

### D.    Plaintiff's "Regular Occupation" and Ability to Perform that Occupation

The most difficult issue in this case concerns the determination of what was plaintiff's "regular occupation" on June 29, 2020. The policy requires that for LTD benefits to be paid for the first 24 months, the insured must not be able to perform the "material duties of his/her regular occupation." (AR 12). The phrase "regular occupation" is not defined in the policy. (AR 11). After the first 24 months, benefits would continue only if the insured cannot perform the material duties of "any occupation." (*Id.*).

While the final decision does not specifically state how defendant has defined plaintiff's occupation in denying benefits, Dr. Hahn's third fallback position in his report is that, "[e]ven if

26

he does not work at his prior exact position, there is no evidence to suggest that he could not work as an attorney doing 'less stressful' legal work." (AR 1822). Defendant argues in its brief in support of its motion for summary judgment that plaintiff's occupation is "attorney" and, without any other vocational analysis, states there are "less stressful" attorney positions he could perform. (Docket no. 11 at 16, 20). Plaintiff defines occupation more narrowly. He argues that he cannot return to his position at MITRE or any position with the same character and comparable duties, and therefore cannot perform the material duties of his regular occupation. (Docket no. 18 at 15–17).

### i. Definition of occupation

In *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270–71 (4th Cir. 2002), the Fourth Circuit cites to *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999) in defining regular occupation. In *Kinstler*, the court held that the "applicable definition of 'regular occupation' shall be a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." 181 F.3d at 252 (quoting *Dawes v. First Unum Life Ins. Co.*, 851 F. Supp. 118, 122 (S.D.N.Y. 1994) (internal quotation marks omitted)). Regular occupation is defined "more narrowly than any means for making a living, but it is not limited to the insured's particular job." (*Id.*).

### ii. Plaintiff's occupation

While it is accurate that plaintiff is a member of the District of Columbia Bar and is an attorney, that is not an accurate description of the general character as his previous employment at MITRE, or the skills and training, and comparable duties he was performing in June 2020. In the application sent to RSL from MITRE plaintiff's occupation is referred to as "Cyber Security" (AR 217) and his title was Principle Cyber Policy Counsel (AR 290). The job description provided to RSL by MITRE does not list attorney as a "professional qualification." (AR 267).

27

In RSL's claim notes dated November 2, 2020, plaintiff's work is described as "involves classified support to intelligence and defense community, not a 9-5 and is very stressful, on call 24/7. He writes and edits legal documents, and delivers policies" and he "is a lawyer and last 12 yrs. has worked w/multiple agencies and sponsors within the DOD, DHS, and DNI." (AR 131). Plaintiff's supervisor provided RSL with additional information concerning plaintiff's duties on November 20, 2020, in which his job was described as constantly interacting with senior leaders in the multiple federal agencies dealing with national security issues which was very demanding and stressful due to high demand, short timelines, and frequent changes in demands. (AR 133). While being an attorney may (or may not) have been helpful in the duties he was performing, it is clear that the general character of his employment with MITRE was providing cyber security advice to high-level personnel in federal agencies. Categorizing his *regular* occupation as an "attorney" and arguably comparing his "material duties" to those of a recent law school graduate who just passed the bar (*i.e.* an attorney) is unreasonable. This is compounded by fact that the administrative record is devoid of any real vocational analysis of plaintiff's *regular* occupation (the character of his employment, his specialized skills and training, and his duties) and seems to hinge on a cardiologist's assessment of what one does in performing "less stressful" work as an "attorney."

In coming to this recommendation, the undersigned believes that the analyses undertaken in *Lasser, Gallagher,* and *Stanford* all support a finding that defendant's categorization of plaintiff's regular occupation as attorney is unreasonable. As discussed above, *Lasser* involved an orthopedic surgeon who was found to be disabled from performing the material duties of his regular occupation given the risk that his cardiac condition would worsen with the stress of being on-call and performing emergency surgery. In that case, RSL undertook an analysis of

28

orthopedic surgeons and surgeons (not all doctors) in its analysis of the material duties of Lasser's regular occupation. *Lasser*, 344 F.3d at 387–388. RSL's attempt to categorize plaintiff's occupation as "attorney" in this case would be like attempting to categorize Lasser as a "doctor" who could perform "less stressful" duties as a "doctor."

Similarly, in *Stanford*, the insured was "a trained nurse anesthetist" with a history of substance abuse. 514 F.3d at 355. The issue in that case was whether the risk of relapse when exposed to fentanyl in the workplace could be considered as not being unable to perform the material and substantial duties of Stanford's regular occupation. The trial court and the Fourth Circuit all considered plaintiff's regular occupation as a nurse anesthetist and not a "nurse," who may or may not be exposed to fentanyl as a part of his/her occupation as a nurse.

Finally, in *Gallagher,* the Fourth Circuit discussed the requirement that the insurer "adopt an appropriate description of the claimant's occupation" which should be "a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." 305 F.3d at 270–271 (quoting *Kinstler*, 181 F.3d at 252). In that case, the employer provided RSL with a description of the insured's duties that failed "to give much detail regarding Gallagher's specific duties." *Id.* at 271. Given the lack of specificity of the actual duties being performed as a company executive and vice chairman and publisher, RSL then did an analysis using the Department of Labor's Dictionary of Occupational Titles for publisher and vice president. *Id.* However, in this case a detailed description of plaintiff's actual duties and responsibilities was provided to RSL, but RSL did not undertake any analysis other than to determine that plaintiff was an "attorney" and was able to perform "less stressful" work as an attorney.

The undersigned recognizes that there is authority that could be interpreted as more broadly applying "regular occupation." For example, in *House v. Am. United Life Ins. Co.,* 499 F.3d 443 (5th Cir. 2007), that court believed that "the district court's distinction between 'trial lawyer' and 'lawyer' too fine under a commonsense interpretation of 'regular occupation.'" *Id.* at 453. The court stated "House's 'regular' occupation was as an attorney, not restricted to his own specific job as a litigation attorney with a uniquely stressful practice, but rather referencing the activities that constitute the material duties of an attorney as they are found in the general economy." *Id.* at 454. However, the facts in that case suggest that this finding should not be interpreted too broadly. In that case House initially returned to his law firm after his heart attack and then continued his legal employment in a non-litigation position with the Louisiana Department of Economic Development. *Id.* at 447. The insurer initially paid nine months of total disability payments and requested that House undergo an independent medical examination to assess his disability claim, but he did not obtain one. *Id.*

After a lengthy discussion of whether the plan was governed by ERISA and whether any Louisiana state law claims were available, the court addressed the degree of the insured's disability. The court stated that under the terms of the applicable policy "disability can be either total or partial but never both" and that total disability requires that the insured be unable to perform "each and every material and substantial duty of his or her regular occupation." *Id.* at 453–454. In that case if the insured can perform "at least one of the material and substantial duties of his regular occupation" he would be considered partially disabled. *Id.* at 453. The court noted that crediting the insured's doctor's opinion that the insured is precluded from resuming his stressful trial practice, he is clearly able to perform "some of the material aspects of his occupation as an attorney" given his post-surgery activities with his firm and with the

30

Louisiana agency which takes him outside the definition of total disability and places him squarely with the definition of partial disability. *Id*. at 454. Given that the policy allowing for partial disability benefits had terminated, House would not be entitled to partial benefits. *Id*. at 455. In essence, the definition of House's occupation as an attorney and not trial lawyer made no difference in the analysis of whether he was entitled to LTD benefits given the language in the applicable policy. A trial lawyer's material and substantial duties would include at least one material and substantial duty of an attorney and House did not show that he was unable to perform each and every material and substantial duty of a trial lawyer.

The significance of the discussion concerning the language of the policy in *House* is that RSL's policy in this case provides that "an Insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period." (AR 12). Under the terms of RSL's policy, if plaintiff satisfies the definition of partially disabled, he is considered totally disabled and entitled to LTD benefits — he is not required to show that he cannot perform each and every material and substantial duty of his occupation.

Given the guidance in *Lasser*, *Gallagher*, and *Stanford*, the undersigned recommends a finding that defendant's categorization of plaintiff's regular occupation as attorney and not taking into consideration the general character of his job at MITRE, including the skills, training, and duties involved was unreasonable.

### iii. Lack of vocational analysis

Notably, defendant did not undertake a vocational analysis as part of the administrative process. Instead, defendant almost exclusively relies on Dr. Hahn's statement that plaintiff could work doing less stressful attorney work. While vocational evaluations are commonly done by insurance companies when evaluating these claims, courts are split on whether it is required.

31

Some courts have held that failing to conduct a vocational evaluation results in an unreasonable decision. *See Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 678 (8th Cir. 2005) (determining that substantial procedural irregularities in defendant's consideration of plaintiff's claim, which included "not [having] a review performed by a vocational consultant," resulted in an unreasonable denial of benefits).  Others have found that an independent vocational analysis is not necessary, as the medical experts can consider the evidence in their evaluations. *Spenrath v. Guardian Life Ins. Co. of Am.*, 564 F. App'x. 93, 100 (5th Cir. 2014) ("Here, the medical experts did not ignore relevant evidence, and they considered how Spenrath's limitations would affect her ability to perform her occupation.  There is no independent requirement that plan administrators list a claimant's occupational responsibilities.").  Even if RSL's categorization of plaintiff's regular occupation as attorney is accepted, there is no indication that Dr. Hahn (a cardiologist with an expertise in pediatric cardiology) is aware of the occupational requirements of "an attorney" and could provide an evaluation of whether plaintiff could perform all the material duties of an attorney on a full-time basis.

The administrative record in this case fully supports a finding that, at the time of the claimed disability, plaintiff was working at MITRE providing high level counseling and advice involving important cyber security issues to various federal agencies.  His position required significant training and experience and involved providing advice to leaders of federal agencies concerning cyber security matters of national importance.  The general character of his job, considering his skill, training, and duties, far exceeds the "attorney" designation.  While it is clear that an insurer's decision should be based on how an appropriately determined regular occupation is performed in the national economy and not for a particular employer, the starting point for that analysis is defining the insured's regular occupation.  In this case, defendant's

32

categorization of plaintiff's regular occupation as attorney was unreasonable and not supported by substantial evidence.[6]

For the reasons stated above, the undersigned recommends a finding that defendant's categorization of plaintiff's "regular occupation" as of June 2022 as an "attorney" is unreasonable and not supported by substantial evidence.

### E.  Defendant has failed to provide any reasoning as to why it determined benefits were appropriate on January 12 but not January 13, 2021.

While this issue may not need to be addressed given the previous recommendations, the undersigned will discuss plaintiff's argument that RSL arbitrarily and capriciously decided that even though plaintiff met the requirements for total disability on January 12, 2021, he was not totally disabled after January 13, 2021.  (Docket no. 14 at 15–18).  Plaintiff cites *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 848 (3d Cir. 2011), where the Third Circuit held that "[a]n administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels towards finding an abuse of discretion."  Plaintiff asserts that defendant had no reason to change its approach to the LTD claim, as nothing changed about plaintiff's underlying risk.  Specifically, plaintiff states that "nothing substantive changed from January 13, 2021 to January 14, 2021" in terms of his coronary artery disease and risk of heart attack.  (Docket no. 14 at 18).

RSL has taken various approaches to plaintiff's claim.  When Nurse House first conducted her medical review on November 20, 2020, she found that plaintiff was totally disabled starting on June 29, 2020 through January 12, 2021 (almost two months after the review

---

[6] For the various reasons discussed above, including the stated reason for denying benefits being related to not taking into consideration risk of future harm, it is not surprising that the final decision does not address the regular occupation issue directly and that defendant did not provide any substantive vocational analysis.

date). (AR 61). Nurse House indicated that there was not sufficient evidence to prove his

ongoing disability past the end of the elimination period on January 12, 2021. (*Id.*; AR 180).

Nurse House's subsequent review on December 28, 2020 confirmed that same position, which

ultimately led to RSL initially denying plaintiff's claim. (AR 62, 182–184). From there, Dr.

Hahn conducted a review that found plaintiff was totally disabled from June 29, 2020 to

December 16, 2020, but there was no objective medical evidence to support an ongoing medical

disability after December 16, 2020. (AR 1820–21). RSL chose not to adopt the December 16,

2020, date from Dr. Hahn, instead using January 13, 2021. (AR 2351–57). In the final decision

RSL found that plaintiff was entitled to one day of LTD benefits from January 12, 2021 to

January 13, 2021, but he was not totally disabled as of January 13, 2021. All of the information

in the administrative record concerning plaintiff's medical condition was the same in making that

inconsistent decision. There is nothing in the record that would support a change in plaintiff's

ability to perform the material duties of his regular occupation from January 12, 13, or 14, 2021.

This is not a situation where a determination is made and thereafter new information is submitted

that would form the basis for a change in that earlier decision. The final decision fails to provide

an explanation for these inconsistent determinations and fails to provide information that the

court can determine if the reasoning is the result of a deliberate, reasoned process.

## V. CONCLUSION

Based on the foregoing, it is recommended that the court find RSL's denial of benefits is

not supported by substantial evidence and was an abuse of discretion. Accordingly, it is

recommended that plaintiff's motion for summary judgment (Docket no. 13) be granted, and

RSL's motion for summary judgment (Docket no. 10) be denied.

**NOTICE**

Failure to file written objections to this report and recommendation within 14 days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 15th day of November, 2022.

/s/

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

35