IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MICHAEL AISENBERG,
    Plaintiff,

    v.                                          Civil No. 1:22cv125 (DJN)

RELIANCE STANDARD
LIFE INSURANCE CO.,
    Defendant.

**MEMORANDUM ORDER**
**(Granting Plaintiff's Motion for Summary Judgment and**
**Denying Defendant's Motion for Summary Judgment)**

This matter comes before the Court after the Honorable Senior District Court Judge T.S.

Ellis, III, granted partial summary judgment and remanded the case on February 21, 2023.

Subsequently, Judge Ellis ordered that this matter be reopened after considering Michael

Aisenberg's ("Plaintiff") and Reliance Standard Life Insurance's ("Defendant") Joint Motion to

Reopen the Case, (ECF No. 36).  The procedural history of this matter will be explained in

greater depth below, but after having reopened the case, the parties both submitted Motions for

Summary Judgment, (ECF Nos. 40, 42), and filed their respective responsive pleadings, (ECF

Nos. 46–49).  Since then, the case was reassigned to the undersigned.  (ECF No. 51.)

Accordingly, the matter stands ripe for determination.  For the reasons stated herein, the Court

hereby GRANTS Plaintiff's Motion for Summary Judgment, (ECF No. 40), and DENIES

Defendant's Motion for Summary Judgment, (ECF No. 42), having found that Defendant abused

its discretion when it denied long-term disability benefits to Plaintiff for a second time.

## I.   BACKGROUND

The Court first addresses the matter's factual and procedural background, which began on February 4, 2022. (ECF No. 1.) Therein, Plaintiff, formerly an attorney for The MITRE Corporation ("Employer" or "MITRE"), a defense contractor in Washington, D.C., relates that he was covered by the Employer's Group Long Term Disability Insurance Plan, which constitutes an employee welfare benefit plan established under the Employee Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. §§ 1001 *et. seq.* (*Id.* at 2.) Defendant serves as the Claims Review Fiduciary, which entails determining whether claimants like Plaintiff are entitled to disability benefits under the disability and insurance plans that they are charged with effectuating. (*Id.* at 3.)

Plaintiff worked for Employer as an attorney in its cyber-security division for twelve years before his doctors advised him to stop working in light of undergoing and recovering from a double bypass heart surgery. (ECF No. 14 at 1, 5.)[1] In that role, Plaintiff advised government officials on cyber-security issues related to national security and was on-call at nearly all times. (*Id.*) Plaintiff described his work at MITRE as "stressful due to high demand and short timelines," and Plaintiff's supervisor noted that Plaintiff "never" worked in a sedentary manner, at least before COVID, as Plaintiff traveled daily for face-to-face meetings and constantly had virtual meetings. (*Id.* at 5.)

Plaintiff eventually began experiencing shortness of breath and mentioned this to his primary care physician in May of 2020. (*Id.* at 6.) That doctor scheduled a non-urgent coronary CT scan for June 29, 2020, which revealed that Plaintiff had "severe stenosis of two arteries and growing stenosis of three arteries." (*Id.*) That day thus constitutes the first day of the

---

[1]      This Order adopts the ECF pagination rather than the PDF pagination.

"Elimination Period" under MITRE's disability policy, as Defendant approved Plaintiff's first disability claim as beginning on June 29, 2020. During the "Elimination Period," which lasts 180 days, no benefits are payable. If a claimant, like Plaintiff, wishes to seek Long-Term Disability Benefits ("LTD Benefits"), he must show that he is still disabled, as understood by Defendant's plan, once the Elimination Period ends.

Plaintiff's diagnosis of arterial stenosis necessitated that he undergo surgery in July of 2020. Initially, the surgery was supposed to only be an angioplasty, but it evolved into a double coronary artery bypass graft, a type of open-heart surgery. (ECF No. 34 ("Mem. Op.") at 2.) After a period of cardiac rehabilitation following his double-bypass, Plaintiff's cardiologist, Dr. Cossa, advised Plaintiff not to return to his work as an attorney, because the stressful nature of the job would cause Plaintiff's heart condition to worsen over time and potentially cause a fatal heart attack. (*Id.*) Based on this recommendation, MITRE submitted a claim to Defendant for LTD Benefits on Plaintiff's behalf. (*Id.*)

Defendant then proceeded to review Plaintiff's claim for LTD Benefits under MITRE's disability and insurance plan to determine if he was eligible for LTD Benefits once the Elimination Period ended. During this process, two of Plaintiff's doctors provided letters warning against Plaintiff returning to his work as an attorney, underscoring that the stressful nature of the job would endanger his health and cause further medical complications. (*Id.* at 3.) Nevertheless, Defendant denied Plaintiff's LTD Benefits claim on January 4, 2021. (*Id.* at 3.) Defendant noted that Plaintiff's doctors "did not provide any physical exam findings, clinical findings, symptoms, or review of systems that would preclude [Plaintiff] from work function beyond January 12, 2021." (Administrative Record ("AR") at 183.)[2] Moreover, Defendant

---

[2]      The Administrative Record is located in (ECF Nos. 7, 8 and 9).

referenced a treadmill test completed by Plaintiff in December of 2020 that demonstrated Plaintiff had normal heart functions, which further supported the benefits denial. (*Id.*)

Plaintiff appealed this adverse determination, triggering Defendant's internal review process. (Mem. Op. at 3.) The appeal, however, provided Plaintiff with no relief, as the reviewing doctor, Dr. Hahn, stated that "[t]here is no randomized controlled trial that shows relieving chronic job stress results in the secondary prevention of cardiovascular events," and that "there is no medical evidence to support that [Plaintiff] currently physically cannot perform his duties." (AR at 1822.) Plaintiff submitted additional documents rebutting Dr. Hahn's remarks, but on December 21, 2021, Defendant issued its final decision denying Plaintiff's claim for LTD Benefits. In so doing, Defendant adopted Dr. Hahn's findings and noted that "limiting exposure/risk . . . does not qualify as being *Totally Disabled*," which constitutes the standard Plaintiff must meet to receive LTD Benefits under Employer's plan. (*Id.* at 2354.) Despite this, Defendant awarded Plaintiff *one* day of LTD Benefits, for the day of January 12, 2021, but terminated those benefits on January 13, 2021. (*Id.* at 200, 2353.) Yet, Defendant provided no explanation as to how Plaintiff went from totally disabled to not overnight.

Plaintiff then appealed under ERISA, bringing the matter into federal court. The parties filed cross-motions for summary judgment, (ECF Nos. 10, 13), and Judge Ellis referred the case to Magistrate Judge Anderson for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Mem. Op. at 4.) Magistrate Judge Anderson found that Defendant had abused its discretion in denying Plaintiff LTD Benefits, as Defendant failed to consider the potential for future harm if Plaintiff were to return to his stressful job at MITRE, and ruled that Defendant incorrectly characterized Plaintiff's "regular occupation" as "attorney." (*Id.*) Defendant

4

objected to both of these conclusions, among others, and Judge Ellis issued a Memorandum

Opinion resolving the issues on February 21, 2023.  (ECF No. 34)

Judge Ellis's Memorandum Opinion considered Defendants' objections to the Report and

Recommendation.  There, Judge Ellis affirmed in part and denied in part.  Relevant here, Judge

Ellis overruled objections and held that:  (1) the Report and Recommendation properly

concluded that Defendant abused its discretion by not considering the risk of future harm

Plaintiff would suffer from returning to a high-stress work environment; and (2) Defendant

improperly failed to consider whether other "less stressful" attorney positions existed in the

national economy.  He affirmed other objections, but as relevant here, Judge Ellis determined

that the Report and Recommendation erred by not deferring to Defendant's construction of the

policy term "regular occupation," which it defined generally as an "attorney" rather than as a

cyber-security counsel at MITRE.

In light of these findings, Judge Ellis remanded the case to the plan administrator

— Defendant — and provided various discrete areas to review on remand.  First, Defendant was

directed to determine whether other "less stressful" attorney positions existed in the national

economy that Plaintiff could perform without risking future harm to himself given his heart

condition.[3]  (Mem. Op. at 16.)  Alongside considering whether there exist alternative, less

stressful attorney positions, Judge Ellis directed Defendant to address "the risk of future harm to

Plaintiff if Plaintiff returns to a high stress job."  (*Id.*)

---

[3]      Judge Ellis's remand Order states:  "[T]his matter is REMANDED to Defendant for
further consideration by the ERISA plan administrator of whether there exist other attorney
positions that Plaintiff could perform without incurring a risk to his cardiac health."  (ECF No.
35 at 2.)

On remand, Defendant arranged for a labor market survey to be conducted "to determine the material duties and exertional demands for the occupation of 'Principal Cyber Policy Counsel' as it is performed within the national economy." (Supplemental Administrative Record ("Supp. AR") at 37.)[4] Here, Defendant apparently abandoned its objection that Judge Ellis sustained. Defendant previously proposed that Plaintiff's regular occupation was that of an "attorney." When Magistrate Judge Anderson rejected that broad definition, Defendant objected and Judge Ellis sustained Defendant's objection, noting that one's regular occupation could be described by the general term "attorney." Defendant abandons that position, as it now describes Plaintiff's regular occupation as that of a "Business and Financial Counsel." (*Id.* at 40.)

Alongside its labor market survey, Defendant commissioned a vocational report that describes the "material duties" required of a Business and Financial Counsel as it is performed in the national economy. (*Id.* at 40–41.) According to the report, the material duties of Business and Financial Counsel include "[p]erform[ing] crisis management when an incident arises," protecting "classified information during trials involving national security subjects" and "[p]rovid[ing] expert-level advice directly to agents and analysts in multiple areas in support of international and domestic terrorism." (*Id.* at 33.) Lastly, Defendant engaged Dr. Mark Eaton, a Board-Certified internal medicine doctor with a sub-specialty in cardiovascular disease, to determine whether Plaintiff was still disabled. (*Id.* at 60–69.)

Dr. Eaton's report echoes the report created by Dr. Hahn for Defendant's initial denial of LTD Benefits, where Judge Ellis found Defendant abused its discretion. Specifically, Dr. Eaton noted that "[t]here are no specific restrictions and/or limitations from a cardiovascular standpoint, and the claimant would be capable of full time work capacity on a consistent basis at

---

[4]     The Supplemental Administrative Record is found at (ECF No. 38).

any level of exertion." (*Id.* at 67–68.) Moreover, as to whether stress could exacerbate Plaintiff's health condition, Dr. Eaton stated "[t]here is no medical documentation nor clinical studies to indicate that reducing or relieving chronic job stress results in secondary prevention of cardiovascular events." (*Id.* at 67.) Dr. Eaton's report remains unclear about whether he reviewed the material duties of Plaintiff's regular occupation when making this assessment, as he does not articulate Defendant's description of Plaintiff's "material duties," nor can the vocational report be found in the list of data reviewed by Dr. Eaton. When Plaintiff then submitted to Dr. Eaton a scholarly article that reviewed the literature on the relationship between work stress and cardiac health, he provided an addendum to his report, noting that it did not change his prior opinion, as the relationship between work-related stress and coronary heart disease has never "been proven in peer reviewed clinical trials." (*Id.* at 79.) Thus, on June 7, 2023, Defendant — for the second time — denied Plaintiff's request for LTD Benefits and Defendant once again appealed. (*Id.* at 31–36.) Having duly considered the background of the matter, the Court now turns to this case's substance.

## II.   DISCUSSION

The Court now considers the summary judgment motions presently before it. Here, the parties litigate whether the labor market survey and the second medical opinion obtained by Defendant satisfies Judge Ellis's directions on remand. Specifically, Judge Ellis adopted the Report and Recommendation in part, but remanded "for further consideration by the ERISA plan administrator of whether there exist other attorney positions that Plaintiff could perform without incurring a risk to his cardiac health," which requires considering the risk of future harm that returning to a stressful job would impose. (ECF No. 35.) The Court too adopts the Report and Recommendation to the same extent as Judge Ellis's Memorandum Opinion. (*Id.*) In light of

this, the Court now turns to determining whether Defendant abused its discretion in denying Plaintiff of his LTD Benefits a second time.

## A. Standard of Review

The policy through which Plaintiff seeks LTD Benefits vests discretionary authority with the claims review fiduciary — Defendant — to interpret the Plan and make benefits eligibility determinations. (AR at 16.) As such, the Court reviews Defendant's second denial of Plaintiff's LTD Benefits for an abuse of discretion.[5] *Griffin v. Hartford Life & Accident Ins. Co.*, 898 F.3d 371, 378 (4th Cir. 2018). Under this standard of review, the Court must uphold Defendant's determination provided that the decision qualifies as reasonable. That is, that the decision resulted from a deliberate, principled reasoning process supported by substantial evidence. *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995). In an ERISA case, the plaintiff carries the burden of proof. *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 276 (4th Cir. 2002).

In determining whether Defendant committed an abuse of discretion, the Court may consider the administrative record available to the adjudicator when it denied benefits. *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 134 S. Ct. 604, 614 (2013). Here, the adjudicator had access to both the administrative record, (ECF Nos. 7–9), as well as the supplemental administrative record, (ECF No. 38). Thus, the Court proceeds with the Administrative and Supplemental Record as the basis for its conclusions.

---

[5]    The parties agree that reviewing Defendant's denial for an abuse of discretion constitutes the appropriate standard of review. (ECF No. 14 at 11–12; ECF No. 41 at 13.)

### B. Making a Valid Claim Under Defendant's Policy

Before starting down the road of substantive analysis, the Court first briefly sets forth the framework for establishing a valid claim under Defendant's LTD Benefits policy. The first analytical step requires determining what constitutes Plaintiff's regular occupation. (AR at 12.) In the Fourth Circuit, one's regular occupation is not the specific job that they claim they are unable to perform, but instead one "of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *Mitchell v. Fortis Benefits Ins. Co.*, 163 F. App'x 183, 190 (4th Cir. 2005).

The second step requires determining what constitutes the material duties of one's regular occupation. One method of delineating those duties in the Fourth Circuit includes referencing the Department of Labor's Dictionary of Occupation Titles ("DOT").[6] *Gallagher*, 305 F.3d at 271–72 (4th Cir. 2002). However, the DOT does not serve as the end-all be-all for outlining the relevant "material duties," as other evidence can also be considered to inform those duties. *See DeLoatche v. Heckley*, 715 F.2d 148, 151 (4th Cir. 1983) (considering, on remand, evidence outside of the Dictionary of Occupational Titles).

Once one's regular occupation and its material duties are defined, Defendant then conducts the final step in the claims process: employing a reasoned and principled process to adjudicate whether a claimant's disability renders them unable to complete the determined "material duties." Claimants are entitled to LTD Benefits under Defendant's plan under two circumstances. The first arises if they can show that they are capable of performing all of the material duties of their regular occupation, but their disability requires that they do so only on a

---

[6]   DEP'T LABOR, *Dictionary of Occupational Titles* (last accessed February 20, 2024), https://occupationalinfo.org/11/110117022.html [https://perma.cc/TY8G-6QLU].

part-time, rather than full-time, basis. (AR at 12.)  Alternatively, claimants stand entitled to LTD

Benefits if they are capable of working full-time but are only able to complete some of the

material duties of their regular occupation due to the claimed disability.  (*Id.*)  In other words, to

support a finding of no disability, Defendant must find that a claimant can complete *all* material

duties of their regular occupation on a full-time basis.  (*Id.* at 12, 21.)

### C. Defining Plaintiff's Regular Occupation

The Court starts the substantive analysis by reviewing Defendant's interpretation of

Plaintiff's regular occupation, an interpretation subject to review for an abuse of discretion.

Here, confusingly, Defendant describes that the purpose of Judge Ellis's remand was to

"determine[e] Plaintiff's 'regular occupation.'"  (ECF No. 41 at 21.)  However, Judge Ellis

already ruled in favor of Defendant's interpretation of Plaintiff's regular occupation on summary

judgment, conclusively establishing that Plaintiff constitutes  an "attorney."  (Mem. Op. at 11.)

Judge Ellis considered Defendant's objection to Magistrate Judge Anderson's conclusion that

Defendant had abused its discretion in defining Plaintiff's regular occupation as "attorney" in its

initial LTD Benefits denial.  (Mem. Op. at 10.)  Upon review, Judge Ellis *sustained* Defendant's

objection, holding that "Defendant's interpretation of the term must be accepted.  Defendant's

interpretation of 'regular occupation' as 'attorney' is not unreasonable."  (*Id.* at 11.)

Accordingly, Judge Ellis granted summary judgment in Defendant's favor on this issue.  (ECF

No. 35 at 2.)

"For purposes of *res judicata*, a summary judgment has always been considered a final

disposition on the merits."  *Adkins v. Allstate Ins. Co.*, 729 F.2d 974, 976 (4th Cir. 1984).

Despite this, Defendant opts to relitigate the merits of this decision in its renewed Motion for

Summary Judgment.  (ECF No. 40.)  Now, Defendant defines Plaintiff's regular occupation not

10

as an attorney, but as the narrower category of "Business and Financial Counsel," whose duties are informed by a labor market survey, amounting to a completely different position than the one it forwarded in its first motion for summary judgment. (ECF No. 11 at 21.)  Plaintiff does not object to this new categorization in its brief in opposition, describing Defendant's new position as amounting to a concession. (ECF No. 47 at 3.)

As a general rule, on the remand of a case after appeal, the agency from which appeal is taken must comply with the mandate of the court and obey the directions therein without deviation. *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967).  This directive, which applies full-well to Defendant, was not followed.  As this Court has already told Defendant when it previously ignored this Court's rulings, disregarding the Court's directives may — standing alone — amount to an abuse of discretion, because if Defendant could effectively reverse the Court when it saw fit, it "would render the court's review of administrative decisions essentially a nullity." *O'Bryhim v. Reliance Standard Life Ins. Co.*, 997 F. Supp. 728, 732 (E.D. Va. 1998). Defendant views Judge Ellis's summary judgment holding differently, apparently believing that Plaintiff's regular occupation remained an open question on remand. (ECF No. 48 at 3 n.1.) However, Judge Ellis's grant of summary judgment — that is, a final judgment on the merits — on this question in Defendant's favor subjects the issue to *res judicata*.

Here, however, Defendant's decision to ignore the holdings and directives outlined in Judge Ellis's Memorandum Opinion and Order becomes harmless, as it hurts its own case and inures to Plaintiff's benefit, as the Court describes below.  Accordingly, the Court does not find that Defendant's refusal to adhere to Judge Ellis's Memorandum Opinion and grant of summary judgment on this issue, on its own, amounts to an abuse of discretion that would require holding in Plaintiff's favor. *See Morgan v. Barnhart*, 142 F. App'x 716, 722–23 (4th Cir. 2005)

(employing harmless error analysis to determine whether an agency adjudicator abused its discretion when it failed to follow remand order).

Because the error in refusing to adhere to Judge Ellis's summary judgment stands harmless and does not alter the Court's ultimate conclusion, the Court adopts Business and Financial Counsel, as informed by Defendant's labor market survey, as Plaintiff's regular occupation for the purposes of reviewing Defendant's LTD Benefits denial for abuse of discretion. Whether or not Defendant's interpretation can be altered in this round of litigation, given Judge Ellis's grant of summary judgment on the issue, does not alter the Court's ultimate conclusion, as the following analysis focuses most centrally on the *material duties* of Plaintiff's regular occupation. Thus, even if Defendant stands subject to *res judicata* on the question of what constitutes Plaintiff's regular occupation, it remained able to litigate what constitutes Plaintiff's material duties. The Court therefore finds that even if Defendant *must* adopt the occupation of attorney as Plaintiff's regular occupation, rather than that of a business and financial counsel, that Defendant's interpretation of Plaintiff's material duties — as outlined in this round of litigation — would not constitute an abuse of discretion as to either.

### D. The Material Duties of Plaintiff's Regular Occupation

The Court now addresses Defendant's interpretation of what constitutes the material duties of Plaintiff's regular occupation. While the Court reviews Defendant's determination of what amounts to material duties for an abuse of discretion, as the term is not defined by the Plan, it must first clarify what position Defendant forwards, as Defendant's briefing and argument lack clarity. *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 270–71 (4th Cir. 2002). On remand, Defendant procured a labor market survey to determine the material duties of Plaintiff's occupation within the national economy. (ECF No. 42 at 25.) Defendant then sent this survey to

a Vocational Rehabilitation Specialist to create a report synthesizing the labor market survey and to outline the material duties of Plaintiff's regular occupation. (ECF No. 42 at 25.) That report also considered the DOL's Dictionary of Occupational Titles in its assessment and ultimately described several "material duties." (ECF No. 42 at 25.)

Here, Defendant suggests that only those duties listed under the DOL's Dictionary of Occupational Titles constitute the material duties of Plaintiff's regular occupation.[7] For instance, Defendant notes that the Dictionary of Occupational Titles does not list "crisis management" and therefore this duty does not constitute a "material duty," even though crisis management is listed as a "material duty" in the labor market survey that it commissioned. (ECF No. 46 at 10 n.2.) Defendant notes that it may rely exclusively on those duties listed in the Dictionary of Occupation Titles to inform its interpretation, as the Fourth Circuit has previously permitted that source to constitute the duties of one's regular occupation for purposes of ERISA. *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 271 (4th Cir. 2002).

While the Dictionary of Occupational Titles may be instructive in demarking a given job's "material duties," it does not stand as the end-all be-all in this case, or under Fourth Circuit case law, for two reasons. First, Defendant itself adopted a more expansive view of Plaintiff's material duties in its most recent denial letter. For example, Defendant listed duties found only in the labor market survey and the vocational report in its ultimate denial letter as constituting Plaintiff's "material duties." *See* (Supp. AR at 33) (listing "crisis management," "provid[ing] expert-level advice" and "protection of classified information during trials" as material duties in its denial letter). That duties found only in the vocational report and labor market survey are

---

[7]     Defendant's Plan does not define which sources will be used to inform what constitutes "material duties."

listed in the denial letter, of course, further supports the conclusion that those duties listed in Defendant's vocational report also constitute Defendant's interpretation of Plaintiff's "material duties." *See Thompson*, 30 F. App'x at 164 (judicial review of disability benefit denial under ERISA "is limited to the reason stated in the denial notice").

Second, the Court must conclude that when the plan administrator provides significant evidence that a claimant's material duties are more expansive than those expressed in the Dictionary of Occupational Titles, that Defendant stands behind the evidence that it submits to the Court. *See DeLoatche*, 715 F.2d at 151 (permitting, on remand, inclusion of evidence beyond the Dictionary of Occupational Titles to inform material duties).  Here, Defendant procured a labor market specialist that helped determine the material duties of Plaintiff's regular occupation.  That specialist determined that the material duties of occupations like Plaintiff's included many duties not found in the Dictionary of Occupational Titles. (Supp. AR at 41.) Neither the Court nor Defendant can close its eyes to evidence that Defendant has submitted, such as the vocational specialist's report.  Indeed, when the Fourth Circuit has upheld interpretations relying exclusively on the Dictionary of Occupational Titles to inform the material duties analysis, the position Defendant takes, the circumstances were such that it was the *only* evidence provided by the plan administrator on the interpretive question. *Gallagher*, 305 F.3d at 272.  Here, however, Defendant not only provides the Court with the Dictionary of Occupational Titles, but it also provides an extensive labor market survey and the report of a vocational specialist analyzing that survey, which explicitly uses the terminology "material duties."

Defendant's vocational specialist, too, concluded that the "Business and Financial Counsel [occupation] as defined by the DOL *and* the material duties provided by the labor

14

market research *both* encompass the occupation as it is performed in the national economy."
(Supp. AR at 41 (emphasis added).)  Defendant's labor market survey details material duties
such as: "protect[] classified information during trials involving national security subjects;"
"perform crisis management" and "lead[] crisis communications;" "interface with senior
management;" "[p]rovide[] expert-level advice directly to agents and analysts in multiple areas
in support of international and domestic terrorism, counterintelligence and cyber investigations,
ensuring compliance with law and policy;" advise on "emergency response;" and more.  (Supp.
AR at 40–52.)  Accordingly, the Court considers both those duties listed in the Dictionary of
Occupational Titles, as well as those outlined by Defendant's vocational specialist in her report,
as constituting the material duties of Plaintiff's regular occupation, regardless of whether
Plaintiff's regular occupation amounts to either an attorney or a business and financial counsel.
With this being Defendant's interpretation, the Court finds that it does not amount to an abuse of
discretion.

### E.  Plaintiff's Ability to Undertake the Material Duties of His Regular Occupation

With Plaintiff's regular occupation and the material duties thereof appropriately
demarcated, the Court now turns to the crux of Plaintiff's appeal of his LTD Benefits denial:
whether he has carried his burden to show that he remains unable to complete the referenced
material duties on account of his cardiac condition.  That is, whether Plaintiff indeed qualifies as
"totally disabled" and if Defendant's determination to the contrary amounted to an abuse of
discretion.  Here, per Judge Ellis's partial grant of summary judgment and accompanying
Memorandum Opinion, failing to assess the risk of future harm that undertaking the material
duties of one's job might impose would amount to an abuse of discretion.  (Mem. Op. at 8
(citing *Stanford v. Continental Casualty Co.*, 514 F.3d 354, 358 (4th Cir. 2008).)  As applied

here, Defendant must "consider[] the risk of future harm to Plaintiff if Plaintiff returns to a high stress job." (*Id.*) Judge Ellis concluded that Plaintiff's job at MITRE was one such impermissibly high-stress position. (*Id.*) At this juncture, the parties provide argument on what boils down to two separate issues.

First, Defendant argues that Plaintiff fails to recognize the difference in stress levels between Plaintiff's past job at MITRE and his regular occupation as Defendant defines it. (ECF No. 40 at 36.) Plaintiff's regular occupation and the stress that it may produce, for purposes of ERISA, constitutes the only relevant one. *Gallagher*, 305 F.3d at 271; *Mitchell v. Fortis Benefits Ins. Co.*, 163 F. App'x 183, 190 (4th Cir. 2005). Here, Defendant notes that Plaintiff has provided no evidence that specifically characterizes the material duties as so stressful that it causes a sufficiently high risk of future harm to render him disabled. Indeed, Defendant posits that the material duties of Plaintiff's regular occupation are not stressful whatsoever. (ECF No. 40 at 17; ECF No. 48 at 4, 11.) This failure, according to Defendant, shows that Plaintiff has not satisfied his burden of proof. (ECF No. 48 at 14.)

In response, Plaintiff suggests that the material duties of his regular occupation are at least as stress-inducing as his previous position at MITRE, given the similarity between the job duties of those two positions. (ECF No. 49 at 2, 11.) If the two jobs are comparably stressful, it would then be incumbent on Defendant to consider the risk that returning to a stressful job could create given Plaintiff's cardiac condition, as Plaintiff has shown already that he should not return to a job as stressful as the one that he was engaged in previously.

The second point of contention revolves around whether Plaintiff has provided sufficient evidence of a risk of future harm, taking into account both Plaintiff's cardiac condition and the stress that may ensue if he resumed the material duties of his regular occupation. In other words,

16

even if the material duties of Plaintiff's regular occupation are stressful, he still must demonstrate that the risk of future harm from that stress constitutes a grave enough threat to his health that he qualifies as "totally disabled." To rebut Plaintiff's evidence, Defendant forwards the opinion of Mark H. Eaton, M.D., a board-certified physician in Internal Medicine with a sub-specialty in cardiovascular disease. (ECF No. 40 at 14.) Plaintiff relies on the opinions of the medical doctors and the administrative record from his initial denial of LTD Benefits and does not provide any new opinions about whether the material duties of his regular occupation would cause enough stress to create a risk of future harm so great as to render him "totally disabled."

### 1. Comparing Plaintiff's Position at MITRE with Defendant's Definition of His Regular Occupation

Judge Ellis already determined that the job responsibilities of Plaintiff's position at MITRE were sufficiently stressful that someone with Plaintiff's cardiac condition could not complete them safely. (Mem. Op. at 13.) Thus, Judge Ellis remanded "to the plan administrator for further consideration of whether there exist less stressful attorney positions that Plaintiff could perform without risk to his cardiac condition." (*Id.* at 12.) Accordingly, if Plaintiff shows that the material duties of Plaintiff's regular occupation cause stress comparable to that he experienced at MITRE, then Plaintiff has made a *prima facie* case for being disabled and thus carried his burden at this step. Then, Plaintiff must demonstrate that Defendant's rationale for denying LTD Benefits, in light of the stressful nature of the duties and Plaintiff's cardiac condition, constitutes an abuse of discretion. *Shupe v. Hartford Life & Accident Ins. Co.*, 19 F.4th 697, 707 (4th Cir. 2021).

As noted, Plaintiff's material duties consist of: "protect[ing] [] classified information during trials involving national security subjects;" "perform[ing] crisis management" and "lead[ing] crisis communications;" "interface[ing] with senior management;" "[p]rovide[ing]

17

expert-level advice directly to agents and analysts in multiple areas in support of international and domestic terrorism, counterintelligence and cyber investigations, ensuring compliance with law and policy;" advise on "emergency response;" "deal with people;" and more.  (Supp. AR at 45–52.)  Plaintiff offers that these duties are "actually very similar to [Plaintiff's] job duties at MITRE."  (ECF No. 49 at 2.)  His duties at MITRE required "24/7 availability" and included "addressing controversial policy issues of national and international importance," delivering regulatory knowledge to clients concerning developments in law and policy, traveling as needed and coordinating high level meetings with national security officials, among others.  (AR at 132–33, 294, 1732.)

As Plaintiff points out, Defendant's own expert and Plaintiff possess a similar understanding of Plaintiff's material duties while employed at MITRE.  (ECF No. 43 at 7.)  Both involve responding to client demands in a time-sensitive environment, interfacing with senior-level clients and leading crisis responses when problems emerge.  These demands are the type of high-stress requirements that many of Plaintiff's treating physicians have opined that Plaintiff cannot safely undertake.  (ECF No. 49 at 3 n.3.)

Defendant argues that the material duties of Plaintiff's regular occupation are not stressful, in part due to "stress [not being] one of the work situations" identified by Defendant's vocational study and the Dictionary of Occupational Titles.  (ECF No. 48 at 4, 11.)  However, none of the twelve attorney positions found in the Dictionary of Occupational Titles labels "stress" as a material duty, yet it would be unbelievable to contend that the lack of that explicit duty renders every attorney position stress-free.[8]  As Plaintiff notes, one can infer that stress may

---

[8]      DEP'T OF LABOR, *Dictionary of Occupational Titles* (last accessed February 20, 2024), https://occupationalinfo.org/11/110117022.html [https://perma.cc/TY8G-6QLU].

flow from a material duty without literally spelling out stress as one such duty.  (ECF No. 43 at 7.)  For example, "crisis management" and acting as a corporate agent, despite not labeling stress as a relevant material duty, surely involve some level of stress.

Accordingly, the Court finds that Plaintiff has established that stress would result from completing the material duties of his regular occupation, using Defendant's interpretations of those terms.  The material duties provided by Defendant are sufficiently similar to the duties that Plaintiff undertook while working at MITRE and the harm that the stress from those duties might cause, according to Judge Ellis and ERISA precedent, must be addressed in the LTD Benefits determination.  (Mem. Op. at 10.)

Moreover, Defendant's most recent denial letter does not contend that no stress would flow from Plaintiff undertaking the material duties of his regular occupation.  Indeed, Defendant's denial letter all but concedes that stress would in fact flow from those duties, as the reason for the LTD Benefits denial was not that Plaintiff would not experience stress while undergoing the material duties described.  Rather, the LTD Benefits denial letter took for granted that the material duties would cause stress and focused on the fact that the relationship between work-related stress and coronary and cardiovascular deterioration was tenuous.  (Supp. AR at 34–35.)  Thus, the Court now turns to reviewing the parties' respective positions on whether, and to what extent, Plaintiff established a risk of future harm if he were to return to a job involving the levels of stress present in Defendant's definition of the material duties of his regular occupation.

### 2.  Considering the Risk of Future Harm if Plaintiff Returns to a Stressful Job

After Defendant refused to acknowledge that the risk of future harm could form the basis of a long-term disability, Judge Ellis plainly noted on remand that "Defendant in this case should

have considered the risk of future harm to Plaintiff if Plaintiff returns to a high stress job." (ECF No. 34 at 8.) The Court will first review the evidence submitted by Plaintiff on this point and then turn to Defendant's rebuttal thereof.

Plaintiff, despite not providing any new expert opinions about the relationship between stress and his cardiac condition, has continuously been advised not to return to a high-stress job, whether that be at MITRE or otherwise. After his surgery, Dr. Cossa, a cardiologist, recommended that he not return to a stressful job, because it would worsen his condition over time. (AR at 328.) Similarly, Dr. Parry, Plaintiff's internal medicine doctor of over ten years, informed Defendant in a December 2020 letter that "[w]ithout dramatic reduction in [Plaintiff's] level of continuous stress, he faces further injury and severe health issues. It seems clear from a medical perspective that [Plaintiff] can no longer engage in any position that would present that level of stress." (*Id.* at 1839.) These opinions were given in broad language, clearly applying to all stressful attorney jobs in general and not just Plaintiff's specific stressful job. (ECF No. 49 at 3 n.3.) In support of the opinions provided by his doctors, four scholarly articles from leading medical journals demonstrating the potential harm that work-related stress may induce on patients recovering from severe cardiac surgeries are included in the administrative record.[9] (AR at 2237–2330.)

---

[9]     The four articles are: Sara D. Jaskanwal, *Association between Work-Related Stress and Coronary Heart Disease: A Review of Prospective Studies through the Job Strain, Effort-Reward Balance, and Organizational Justice Models*, 7 J. AM. HEART ASSOC. 27 (2018) (noting that "[t]here are several mechanisms by which it is plausible that work stress can contribute to the development of [coronary heart disease]"); Mika Kivimaki et al., *Work Stress and Risk of Death in Men and Women Without Cardiometabolic Disease: A Multicohort Study*, 6 LANCET 705 (2018) ("In men with cardiometabolic disease, the contribution of job strain to risk of death was clinically significant."); Joel E. Dimsdale, *Psychological Stress and Cardiovascular Disease*, 51 J. AM. COLL. CARDIOLOGY 1237 (2008) ("One would have to conclude that the overall data suggest that stress contributes to adverse clinical cardiac events and provides a milieu of increased vulnerability to the heart."); Massimo Fioranelli et al., *Stress and*

In response to this data and the opinions of Plaintiff's treating physicians, Defendant hired Dr. Mark H. Eaton to evaluate whether stress could exacerbate Plaintiff's cardiac condition. As noted, Dr. Eaton's opinion stands entirely unclear on which material duties that he considered in his determination that they were not sufficiently stressful to endanger Plaintiff's health, as he does not reference a single "material duty" in his four-page opinion. (Supp. AR at 66–69.) Moreover, Dr. Eaton does not evaluate how much stress Plaintiff can sustain without risking his own safety and wellbeing. Nor does Dr. Eaton consider whether the specific material duties described by Defendant are too stressful and instead opines generally on the relationship between "typical work stress" and cardiac health. Overall, Dr. Eaton's opinion stands substantially similar to Dr. Hahn's — Defendant's medical expert before remand — whose opinion the Court previously ruled amounted to an abuse of discretion given that it did not sufficiently address the risk of future harm that might befall Plaintiff should he return to a stressful job. (ECF No. 35.)

Dr. Eaton, like Dr. Hahn, denies the relationship between stress reduction and the prevention of cardiovascular events all together. (*Id.* at 67.) Dr. Eaton notes, "[t]here is no medical documentation nor clinical studies to indicate that reducing or relieving chronic job stress results in secondary prevention of cardiovascular events." (*Id.*) Indeed, "claimant's work stress would not exacerbate his medical condition." (*Id.*) Dr. Eaton reviewed only one of the four studies that were part of the administrative record, and in response to the one study that he reviewed, he admitted that there was evidence to support the assertion that reducing job stress

---

*Inflammation in Coronary Artery Disease: A Review Pyschoneuroendocrineimmunilogy-Based*, 9 FRONTIERS OF IMMUNOLOGY (2018) ("A growing body of evidence has demonstrated a close relationship between high levels of cortisol and increased risk of ischemic heart disease and cardiovascular mortality.").

helped those afflicted with cardiovascular disease, but since none had been proven in peer-reviewed trials, discounted the article entirely. (Supp. AR at 79.)

In a similar vein to Dr. Eaton, Dr. Hahn believed that Plaintiff's doctors' opinions that future job stress would result in further cardiovascular 'deterioration' was unsubstantiated for two reasons relevant here. (AR at 1821.) First, like Dr. Eaton, Dr. Hahn noted the apparent lack of peer reviewed or randomized control trials demonstrating the relationship between chronic work stress and the prevention of cardiovascular events. (*Id.* at 1821.) Judge Ellis described this position in a prior proceeding as "nonsense," as "[t]here isn't a single cardiologist who would tell you: Yes, you've had a double bypass, you have heart problems; go out and get the highest stress job you can find. That's okay, because we don't have a double-blind medical study that shows that that's bad. That's nonsense." (ECF No. 33 at 10–11.) The Report and Recommendation also rebutted Defendant's assertion, noting that Plaintiff's extensive evidence in the administrative record clearly demonstrates the relationship between work stress and cardiac health, despite the absence of randomized clinical trials. (ECF No. 24 at 17.) And second, Dr. Hahn stated that there was no evidence that Plaintiff could not do "less stressful" legal work. (AR at 1821.) As to this assertion, Judge Ellis ordered on remand for Defendant to consider "whether there exists other attorney position that Plaintiff could perform without incurring a risk to his cardiac health." (ECF No. 35 at 2.)

With the record reviewed and the parties' positions squarely laid out, the Court now addresses whether Defendant abused its discretion for a second time when it denied Plaintiff LTD Benefits.

### F. Application of the *Booth* Factors

The Fourth Circuit has laid out eight non-exhaustive factors that a reviewing court must consider when determining the reasonableness of a claim denial. These factors include:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the [plan administrator's] interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA (7) any external standard relevant to the exercise of discretion; and (8) the [plan administrator's] motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000). These factors inform whether the administrator's decision was the product of a "deliberate, principled reasoning process" and "supported by substantial evidence." *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010). "Substantial evidence" refers to "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011). In addition to those factors, the Court informs the following analysis with Judge Ellis's Memorandum Opinion, which held that failing to consider the risk of future harm when the material duties of a claimant's regular occupation cause stress and the claimant suffers from a cardiac condition constitutes a *per se* abuse of discretion. (Mem. Op. at 8); *see Stanford*, 514 F.3d at 358 (noting that failing to consider the risk of future harm could amount to an abuse of discretion); *Lasser v. Reliance Standard Life Ins. Co.*, 344 F.3d 381, 391 (3d Cir. 2003) (holding that failing to consider the risk of future harm a doctor would incur from stress related to returning to surgical work amounted to an abuse of discretion).

The first factor concerns whether the plan's language provides the plan administrator with discretion, which thus entitles it to abuse of discretion review, and whether Defendant's

23

the Court noted above, Defendant's determination that Plaintiff's regular occupation was an "attorney" was sustained over Plaintiff's objection when Judge Ellis issued a final judgment on the merits as to that question in the original appeal. (ECF No. 35 at 2.)  More yet, Defendant does not even address the stress levels caused by the material duties of the attorney position that it does decide stands relevant here.  Instead, Defendant rejects outright that those duties cause any stress, because stress was not literally listed among the material duties returned by Defendant's labor market survey specialist nor did the Dictionary of Occupation Titles list "stress" as a duty.

Judge Ellis's second instruction on remand called for Defendant to incorporate stress levels experienced by attorneys into a medical opinion on Plaintiff's ability to function as one without endangering his health. (Mem. Op. at 12–13.)  The first physician hired by Defendant to review Plaintiff's claim, Dr. Hahn, apparently was "[un]aware of the occupational requirements of an attorney" and therefore could not "provide an evaluation" on whether Plaintiff was disabled due to stress, thus leading to Judge Ellis's decision to remand. (*Id.* at 13.)  This remand instruction too stands reasonable, as a medical doctor cannot provide an opinion on whether one can return to a stressful job without endangering their health unless that doctor in fact knows just how stressful that job might be.

Defendant likewise failed to adhere to this instruction.  Here, Defendant did not provide its second reviewing physician, Dr. Eaton, with any indication of the varying degrees of stress that may flow from the material duties previously described.[10]  Defendant also did not provide

---

[10]   As noted, the Court interprets Plaintiff's material duties to encompass those articulated by the Dictionary of Occupational Titles as well as those reported by Defendant's labor market survey and vocational specialist.  While Defendant appears to suggest that only the Dictionary of Occupational Titles can inform Plaintiff's "material duties," it does not relate even this narrower set of duties to Dr. Eaton.

Dr. Eaton with Plaintiff's "material duties," as neither the labor market report nor any other document that would relate Plaintiff's material duties constitutes part of the listed evidence reviewed by Dr. Eaton.  (Supp. AR at 60–66.)

Rather, Defendant asked Dr. Eaton to opine on a much broader question, one that fails to consider the specifics of Defendant's regular occupation.[11]  Here, Defendant asked Dr. Eaton to "address the effect that work stress may have on the claimant's medical condition, and whether a typical amount of work stress would exacerbate the claimant's condition to the point it puts him at risk of future episodes." (Supp. AR at 67–69.)  Dr. Eaton does not reference either the material duties of Plaintiff's regular occupation as defined in this round of briefing or the material duties of an "attorney," which was Defendant's interpretation before remand.  Dr. Eaton also uses the term "typical work stress" in assessing that Plaintiff can sustain stress levels without harm to his cardiac condition, but fails to articulate what level of stress the term "typical work stress" encompasses, rendering it impossible for the Court to determine whether his decision adequately addresses the questions on remand or the questions of this specific case more generally.  This error is heightened by the fact that three of Plaintiff's own doctors put Dr. Eaton on notice that they believed Plaintiff's "occupation as an attorney would provide excessive stress over time[,] . . . [which] would be considered detrimental to his health."  (AR at 372; 1839); *accord Geiger v. Zurich American Insurance Co.* 72 F.4th 32, 39 (4th Cir. 2023) (holding that claimant's doctors must put claims administrators on notice of stress-related cardiac disabilities).

---

[11]     Dr. Eaton did review medical notes that describe Plaintiff's role as an attorney for MITRE.  However, as Defendant repeatedly notes, only the material duties of one's regular occupation, not one's specific previous occupation, are relevant to the disability assessment. (ECF No. 46 at 1.)

Instead of assessing how much stress that Plaintiff can withstand given his cardiac condition, as Judge Ellis ordered, Dr. Eaton repeats the assertion that Dr. Hahn made during the first appeal, which flatly rejects the existence of a relationship between work-related stress and cardiac health.  In relevant part, Dr. Eaton notes that "[t]here is no medical documentation nor clinical studies to indicate that reducing or relieving chronic job stress results in secondary prevention of cardiovascular events." (Supp. AR at 35.)  Despite there being four scholarly articles in the administrative record, Dr. Eaton reviewed only one of them, which does detail extensive medical documentation indicating that job stress results in secondary prevention of cardiovascular events.  This article — the sole article that he did review — surveyed the literature on work-related stress and cardiac health, which he noted supported his conclusion as the article that described the inconclusive nature of the link between work stress and cardiac health.  (*Id.* at 79.)  However, Dr. Eaton did not articulate why conflicting evidence in that article, which extensively demonstrates a link between cardiac health disease and work stress, was unpersuasive, as is required in the Fourth Circuit.[12]  *Smith v. Cox Enterprises Inc.*, 2022 WL 4624727, at *11 (E.D. Va. Sept. 30, 2022).   As noted, Dr. Eaton also failed to address the other three scholarly articles present in the record.  Judge Ellis and the Report and Recommendation found that Plaintiff's scholarly articles combined with the opinions of three treating physicians sufficiently demonstrate that future job-stress could negatively affect his cardiac condition.  (Mem. Op. at 8.)  Dr. Eaton, like Dr. Hahn, was obligated to confront that data.  Neither did.

---

[12]     The article notes that "[t]here are several mechanisms by which it is plausible that work stress can contribute to the development of [coronary heart disease]." Jaskanwal, *supra* note 8. The article describes six potential mechanisms as "coagulation, inflammation, maladaptive behaviors, autonomic nervous system and endocrinologic." *Id.* at fig.3.  Dr. Eaton did not articulate why he found these links unpersuasive, instead he dismissed them outright.

For a benefits denial to withstand abuse of discretion review, plan administrators must address conflicting evidence. *White v. Eaton Corp. Short Term Disability Plan*, 308 F. App'x 713, 717–18 (4th Cir. 2009); *Smith*, 2022 WL 4624727, at *11. Here, Defendant, through Dr. Eaton, did not do so sufficiently, having reviewed only one of the four studies in the administrative record, studies that were also described by the Report and Recommendation as well as by Judge Ellis's Memorandum Opinion. And even in the case of the one study that Dr. Eaton did review, he did not address why the conflicting evidence was unpersuasive.

More issues beyond ignoring record evidence plague Defendant's case. Judge Ellis remanded, in part, because "there [was] no evidence that Dr. Hahn was aware of the occupational requirements of an attorney" and thus was unable to opine on whether Plaintiff was unable to complete the material duties of that role. (ECF No. 34 at 13.) That same issue still exists. Medical doctors cannot opine on whether a claimant can undergo the material duties of their regular occupation after a severe cardiac surgery if that doctor has no awareness whatsoever of the potential stressors that said regular occupation and material duties may entail. Here, Defendant provides no evidence that demonstrates that Dr. Eaton knew the material duties of Plaintiff's regular occupation or the level of stress those duties might provoke. Thus, there exists no basis for his opinion that Plaintiff was not disabled due to the harm that stressful working conditions may impose. Even if Dr. Eaton did know what constituted Plaintiff's material duties,[13] his failure to assess the risk of harm that stress might cause for a patient recovering from cardiac surgery and his failure to address conflicting evidence on that issue underscores the

---

[13]     The Court reiterates that it remains unclear whether Dr. Eaton considered Plaintiff's material duties when making his assessment. The list of materials reviewed by Dr. Eaton do not include the vocational report or the Dictionary of Occupational Titles and his own report does not reference a single material duty. (Supp. AR at 60–69.)

insufficiency of the materials used in Defendant's denial of Plaintiff's LTD Benefits claim. The third *Booth* factor thus weighs firmly against Defendant.

The fourth *Booth* factor focuses on whether Defendant has provided consistent interpretations of the plan at issue. As the Court discussed, Defendant has not done so. First, Defendant inexplicably interpreted the term regular occupation to mean "attorney" in the first round of litigation, received a summary judgment opinion in their favor on that interpretation, (ECF No. 35), and then decided to change its interpretation on remand. This inconsistency is not trivial, as the inconsistency pertains to one of the single most important terms in Defendant's LTD Benefits plan.

The second inconsistency stems from Defendant's conclusion that Plaintiff was entitled to LTD Benefits for one day and one day only — January 12, 2021. (AR at 2355.) For a reason that has not been explained in any of its briefings to date, Defendant decided that on January 13, 2021, Plaintiff was no longer entitled to LTD Benefits.[14] Defendant proffers no rationale for how it determined that Plaintiff went from being totally disabled on January 12, 2021 to no longer disabled on January 13, 2021. (ECF No. 34 at 15.) Such unexplained reasoning makes it impossible for the Court to ensure that the LTD Benefits denial was the result of a deliberate, principled reasoning process. *See Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 848 (3d Cir. 2011) ("An administrator's reversal of its decision to award a claimant benefits without receiving any new medical information to support this change in position is an irregularity that counsels

---

[14]    Defendant objected to the Report and Recommendation, which pointed out this inconsistency, on the grounds that it applied an "estoppel theory." (Mem. Op. at 15.) Judge Ellis overruled that objection, finding that the Report and Recommendation did not adopt that theory. (*Id.* at 15.) The Court likewise does not reference this inconsistency to implicate an estoppel theory. Rather, the Court uses it only to inform the *Booth* factors, as it demonstrates an inconsistency that forces the Court to question whether Defendant employed a deliberate and principled reasoning process when it denied Plaintiff of LTD Benefits.

towards finding an abuse of discretion."). Accordingly, the fourth *Booth* factor likewise weighs toward finding an abuse of discretion.

The fifth *Booth* factor queries whether Defendant's decision-making process was reasoned and principled. In some sense, this factor is a composite of the *Booth* factors when considered holistically, as each of the factors are geared toward ensuring that an ERISA decision stems from reasoned, rational and principled decision-making. As noted, Defendant has failed to demonstrate this on multiple fronts. When its medical doctor rendered an opinion on Plaintiff's ability to undertake the material duties of his regular occupation, he did so without knowing the scope of those duties. Even if he did, he did not articulate that stress deriving from those duties would not cause harm to Plaintiff given his cardiac condition and instead opted to reject the relationship between cardiac health and stress altogether, a position already described by Judge Ellis as "nonsense." (ECF No. 33 at 11.) Defendant also found Plaintiff to be disabled on one day, but not the next, without any explanation. That is, Defendant initially found Plaintiff able to work without any evidence of a reasoned, principled process. (ECF No. 24 at 12–13.)

Moreover, the medical opinion offered by Dr. Eaton, which Defendant heavily relies on, suffers severe deficiencies. As the Report and Recommendation noted, there exists extensive evidence documenting the relationship between stress and the prevention of cardiovascular events. (ECF No. 24 at 17.) Four such studies were in the administrative record, yet Dr. Eaton opined only on one, and opines in his report that "[t]here is no medical documentation . . . to indicate that reducing or relieving chronic job stress results in secondary prevention of cardiovascular events," indicating that he did not review record evidence to the contrary. And coincidentally, Dr. Eaton's own medical practice advocates the benefits that reducing stress can have on cardiac health. (ECF No. 42 at 11.) For instance, Dr. Eaton's clinic notes that

30

preventative cardiology, which includes stress reduction, "helps reduce your risk of serious heart and vascular issues," which are the same issues that Plaintiff experiences.[15]  As noted by Plaintiff, Dr. Hahn's own practice *also* conceded the existence of a link between stress and cardiac health.  (AR at 1822.)

Furthermore, Dr. Eaton relies on exercise testing conducted in December of 2020 to support his conclusion regarding Plaintiff's disability, as those tests showed "no evidence" of ongoing impairment after that date.  (Supp. AR at 67.)  However, that those tests were conducted after Plaintiff had been out of work for many months, far and away from the work-induced stress this matter implicates, creates the reason that Dr. Eaton was to consider the risk that future work-induced stress could pose to Plaintiff's condition, as Judge Ellis commanded.  The concerns expressed by Plaintiff's doctors, for instance, were not that he could not handle certain physical exertion in December of 2020.  Rather, they were worried about the effect that future stress could have on Plaintiff's health, given his cardiac condition.  *See Buffaloe v. Reliance Standard Life Ins. Co.*, 2000 WL 33951195, at *7 (E.D.N.C. Oct. 26, 2000) ("[T]he disability resulting from heart and vascular disease is not only that a patient may have difficulty performing tasks requiring physical exertion, but more critically the risk that the patient may suffer another heart attack or stroke.").

To be sure, Dr. Eaton may be correct that exercise tests may demonstrate that someone with Plaintiff's condition will not have a cardiac episode, even if they are in a stressful environment.  The Court would likely be obligated to accept that opinion, despite it contrasting with the opinions of Plaintiff's physicians and the academic literature in the record, given the

---

[15]     SACRAMENTO HEART & VASCULAR MED. ASSOC., *Preventative Cariology* (last accessed February 20, 2024), https://www.sacheart.com/service/preventive-cardiology [https://perma.cc/B6KQ-QNPU].

standard of review. But Dr. Eaton does not just disagree with the record evidence, he ignores it, as he does not explain his position or articulate why adverse evidence stands unpersuasive. Instead of considering any adverse evidence, Dr. Eaton rejects entirely the premise that stress could inflame cardiac conditions, unreasonably disregarding the opinions of Plaintiff's treating physicians and contrary academic literature. *Cf. Stanford*, 514 F.3d at 358 ("[T]he risk of a heart attack is different . . . . A doctor with a heart condition who enters a high-stress environment like an operating room 'risks relapse' in the sense that the performance of his job duties may *cause* a heart attack.").

Dr. Eaton apparently found no credibility in the reports of Plaintiff's three physicians, each of whom described stress as a reason not to return to working as an attorney, given that Dr. Eaton did not address any of their comments nor call them to discuss Plaintiff's cardiac condition. *See Williams*, 609 F.3d at 633 (holding that a denial was not reasoned and principled when the plan administrator "does not address evidence from [claimant's] treating physicians concerning [claimant's disability]"). While it is true that Defendant need not "automatically accord special weight" to a Plaintiff's physician, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the Fourth Circuit has held that a district court may nevertheless give more weight to the claimant's physician when they have repeatedly treated the claimant, in contrast to physicians hired by plan administrators to merely review a claimant's file, *Tekmen v. Reliance Standard Life Insurance Co.*, 55 F.4th 951, 964 (4th Cir. 2022). Here, the Court finds that Dr. Eaton, who was hired by the plan administrator, and his blatant refusal to engage with or even recognize the opinions of three credible physicians whose opinions contrasted with his own, one of which had been treating Plaintiff for over a decade, counsels toward finding an abuse of discretion. While the Court believes Dr. Eaton to be credible, he must engage with adverse

32

evidence. If he does not, then the Court is left with nothing to review, rendering it impossible for it to execute its role in ensuring that plan administrators make decisions stemming from a reasoned and principled process. *Williams*, 609 F.3d at 633.

Defendant forwards several cases in support of its position. As Plaintiff has pointed out, they are inapposite. (ECF No. 18 at 18–23; ECF No. 46 at 22–23.) In *Pini v. First Unum Life Ins. Co.*, the Western District of Pennsylvania upheld a decision to deny LTD Benefits under facts similar to those here. *Pini v. First Unum Life Ins. Co.*, 981 F. Supp. 2d 386, 412–415 (W.D. Pa. 2013). However, that decision was supported by the fact that the claimant's own cardiologists agreed that the claimant could continue working in her regular occupation, if it were for a different employer. *Id.* at 415. Similarly, in *Napoli v. First Unum Life Ins. Co.*, the claimant's cardiologist noted that the claimant "could tolerate a return to work" and that he "would not suggest otherwise." *Napoli v. First Unum Life Ins. Co.*, 2005 WL 975873, at *3 (S.D.N.Y. April 22, 2005). In another case offered by Defendant, claimant's doctors never suggested that the claimant could not perform the duties of his occupation on account of their stressful nature, which led to a benefits denial that withstood abuse of discretion review. *Geiger v. Zurich American Ins. Co.*, 72 F.4th 32, 39–40 (4th Cir. 2023). Unlike each of those three cases, Plaintiff's two cardiologists and his internal medicine specialist have specifically and consistently articulated that Plaintiff cannot work in any high-stress position, like that of an attorney, without jeopardizing his health. They have also never suggested that changing employers would mitigate the risk of future harm, nor have they endorsed Plaintiff's ability to return to stressful work.

Taken together, (1) ignoring, without reason, credible physicians who have been treating a claimant for over a decade, (2) not engaging with multiple studies in the administrative record

that articulate the relationship between work stress and cardiac health, and (3) refusing to consider the risk of future harm that stress may cause all indicate the lack of a reasoned and principled decision-making process. Inapposite case law does not salvage Defendant's argument. Accordingly, the Court concludes that Defendant did not undergo the deliberate, principled reasoning process necessary to hold *Booth*'s fifth factor in its favor.

The sixth, seventh and eighth *Booth* factors, which concern procedural safeguards, external standards relevant to the exercise of discretion and conflicts of interest, are not implicated here, nor has any party suggested otherwise. Importantly, the eight *Booth* factors are not exhaustive of what the Court may consider on appeal. Thus, in addition to the *Booth* factors firmly weighing against Defendant, the Court further finds that Defendant's refusal to follow both instructions encompassed in Judge Ellis's Memorandum Opinion, (ECF No. 34), likewise reflects a process falling short of reasonableness required to survive abuse of discretion review.

*          *          *

Accordingly, the Court finds that three *Booth* factors counsel toward finding that Defendant abused its discretion when it denied Plaintiff his LTD Benefits. Defendant was consistently inconsistent, as it changed its position on the definition of Plaintiff's regular occupation despite receiving a merits judgments dictating otherwise, and changed its position on whether Plaintiff was disabled between January 12, 2020 and January 13, 2020 without any explanation. Defendant did not adhere to Judge Ellis's remand order directing Defendant to improve the adequacy of the materials underlying its initial denial. Instead, Defendant flatly rejected the premise that stress can affect cardiovascular health, the same mistake that Judge Ellis held constituted an abuse of discretion in his Memorandum Opinion. *See* (ECF No. 34 at 8) ("Defendant abused its discretion in failing to consider and assess the risk of future harm that

34

Plaintiff faced from returning to his high stress position."). And Defendant failed to explain why it refused to even consider the opinions of Plaintiff's three treating physicians, while also ignoring the majority of the scholarly sources demonstrating the link between work-stress and cardiovascular health. The Court does not place any special weight on any of the *Booth* factors described herein. However, when taken together, the Court concludes that they amount to Defendant having abused its discretion in denying Plaintiff his LTD Benefits.

## III.   CONCLUSION

For the reasons stated, Defendant's denial of Plaintiff's application for LTD Benefits does not derive from "a deliberate, principled reasoning process." *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999). The Court therefore holds that Defendant abused its discretion in denying Plaintiff his LTD Benefits, effective January 12, 2021. As such, the Court hereby DENIES Defendant's Motion for Summary Judgment, (ECF No. 42), and GRANTS Plaintiff's Motion for Summary Judgment, (ECF No. 40). The Court hereby ORDERS that Defendant provide Plaintiff with payment of back benefits and interest dating to January 12, 2021, the first day that Defendant retracted benefits under the Plan. The Court further ORDERS Defendant to provide Plaintiff with any other benefits in accordance with the Plan, consistent with the Court's conclusion that Plaintiff was "totally disabled" on January 12, 2021 and remains so to this day. Because Defendant has now twice abused its discretion, the Court exercises its discretion and determines that remanding for further consideration would be unproductive. *See Black & Decker*, 550 F.3d at 362–63 (noting that the Court has discretion on whether to remand the case to the plan administrator and that remand should be used "sparingly").

As to attorneys' fees, under *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017(4th Cir.1993), a five-factor test determines the propriety of a fee award for successful ERISA

plaintiffs. *Id.* at 1029.  Those factors are: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy a fee award; (3) whether an award of fees against the opposing party would deter others from acting under similar circumstances; (4) whether the party requesting the fee award sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' contentions. *Id.*  Here, Defendant did not act in bad faith in defending this claim, but it stands capable of paying a fee award given its corporate size.  The third factor weighs against fees, as there exists no clear reason to disincentivize Defendant's conduct.  The fourth factor also counsels against fees, as there does not appear to be a significant legal question at stake, and the fifth factor is neutral.  Accordingly, the Court does not award Plaintiff attorney's fees under 29 U.S.C. § 1132(g)(1).

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: February 21, 2024